Beard et al. *v.* Beard.

it, we are of opinion, that, for the purposes of this suit, it is substantially sufficient. The judgment must be affirmed.

*Per Curiam.*—The judgment is affirmed, with costs.

---⟨◇⟩---

## BEARD *et al. v.* BEARD.

JURISDICTION—PERSONAL JUDGMENT—ALIMONY.—It is competent for the Legislature to authorize the courts of the State to render personal judgments for alimony, in divorce cases, upon constructive notice, against citizens of the State, but it can not authorize such judgments, upon such notice, against the citizens of another State, unless the latter submit to the jurisdiction of our courts by voluntarily appearing to such actions therein.

SAME.—If a resident of this State, whilst temporarily absent, is constructively notified of the pendency of such an action, such service is void, because the same should have been made by copy of process left at his last place of residence; but, if he is a non-resident, then no personal judgment for alimony, if rendered against him, will be operative or valid, unless made so by his voluntary appearance to the action.

APPEAL from the *Marion* Circuit Court.

PERKINS, J.—In *December,* 1856, *Dorothea Beard* obtained a divorce and 1,000 dollars alimony against her husband, *John Beard.* In *May,* 1859, said *Dorothea* filed an amended complaint against said *John,* on the judgment for alimony, and also sued out a writ of attachment, and process of garnishment against the *Indiana Central Railway Co.,* alleging that

VOL. XXI.—21.

Beard et al. *v.* Beard.

that company was indebted to said *John Beard* in a large sum of money, viz: 4,000 dollars.

In *September*, 1859, said *John Beard* appeared to the suit, and demurred to the complaint. The demurrer was overruled and *John* answered, averring that when he married said *Dorothea*, he was a citizen of *Wayne* county, *Indiana;* that he afterwards removed to and resided in *Indianapolis;* that he lived with his said wife between one and two years, during which time she, by her extravagance, nearly ruined him pecuniarily, and was determined to quite effect that object; that to save himself he left her and went to *Illinois* to live with his children by a former wife, and, afterwards, went from there with them to *Kansas.* He avers that the charges in her complaint for a divorce were false and fraudulent, but he does not allege that there was any fraud in the trial of them in the Court. He avers that no notice, except by publication against him as a non-resident, was ever given him, and that he did not have actual notice of the judgment against him till six months after it was rendered.

A demurrer was sustained to his answer, and judgment was rendered against him, and also against the railroad company as garnishee for the amount of the judgment for alimony, &c.

The answer of the railroad company was a good bar to a judgment against her; but issue was taken on it, there was judgment against her after a trial, and the evidence is not in the record. See *The Junction Railroad Company* v. *Cleany*, 13 Ind. 161.

The only question in the case is this: could a valid personal judgment be rendered against *Beard* in a divorce suit upon constructive notice, that is, as we define it, in our State, so far as we resort to such notice at present, by publication. 16 Ind. 429; see *The King* v. *Chandler*, 14 East. Rep. 267. We have a general statute that "no personal judgment shall be

rendered against a defendant constructively summoned, who has not appeared to the action." 2 G. & H. p. 229, sec. 395. And we have a further statute that, "parties against whom a judgment has been rendered without other notice than the publication in the newspaper herein required, except in divorce cases, may have such judgment opened, and be let in to defend at any time within five years." 2 G. & H. 66, sec. 43.

But on the same day, and later thereon, according to the order of the acts in the statute book, was passed the statute regulating divorces; and that statute provides that divorces may be granted upon notice by publication, and that the Court, in such cases, may render a decree or judgment for alimony, which must be a personal judgment. 2 G. & H. 348, *et seq.; Rice* v. *Rice*, 6 Ind. 100. And, on the 4th of *March*, 1859, more than six months before the defendant appeared to this action, even, he not having initiated any steps on his own part to vacate it, though he had actually known of its existence for two years, the Legislature enacted that subsequent judgments for alimony, in divorce cases, might be opened at any time within two years. 2 G. & H. p. 348. Now, the clear inference from the act of the defendant in lying by so long after knowledge of the judgment, without taking any steps to set it aside for fraud, or otherwise, is that he did not claim the right to do so; and the clear inference from all the acts of the Legislature on the subject is, that judgments for alimony in divorce cases, though rendered upon publication, are binding and valid as personal judgments, though judgments generally when rendered upon such notice are not so.

The question, then, is one of power, on the part of the Legislature to authorize such a judgment.

In governments where the Legislature, as in case of the British Parliament, is possessed of the supreme power of the State, it can hardly be doubted that it would be competent

for such legislatures to authorize personal judgments upon constructive notice. Such judgments would not be held void as against natural right. See *Sturgis* v. *Fay*, 16 Ind. 429. Says Chief Justice *Marshall*, in the case of *The Mary*, 3 Cond. Rep. 335, "it is a principle of natural justice, of universal obligation, that before the rights of an individual be bound by a judicial sentence, he shall have notice, either actual or implied, of the proceedings against him. Where these proceedings are against the person, notice is served personally, or by publication; where they are *in rem*, notice is served on the thing itself."

Nor are such judgments, where rendered against resident citizens of the State, void as against the course of the common or civil law. The common law provides for substituted or constructive service, where personal service could not be had. See the whole of chapter 8, in the first volume of Daniel's Chancery Practice, Perk. ed., commencing at p. 495, the subject of the chapter being, " of process to compel appearance." See, also, *George* v. *Fitzgerald*, 12 Louisiana Rep. p. 604, cited in American Leading Cases, vol. 2, p. 805; so in *Illinois*.

In *Welch* v. *Sykes*, 3 Gilman 197, Judge *Treat* says: "It is competent for each State to prescribe the mode of bringing parties before its courts. Although its regulations in this respect can have no extra-territorial operation, they are nevertheless binding on its own citizens." Now, though our government is not absolute, nor is the legislative power omnipotent, yet it is only restrained, in this particular, to the extent that no man shall be deprived of his property, &c., except by due course of law, which is construed to mean a trial according to the course of the common law. 2 Kent's .Comm., 6 ed., p. 12 and notes; *Taylor* v. *Porter*, 4 Hill (N. Y.) R. 140. In *Borden* against *The State*, 6 Eng. (Ark.) Rep. 510, in speaking of the course of the common law, in obtaining personal judg-

ments, without actual notice, and claiming that such judgments are not necessarily invalid, it is said:

" The common law proceeding of outlawry was inconsistent with such an idea to its full extent. The result of this proceeding was, in the first place, a judicial sentence by which the defendant incurred a qualified forfeiture of his lands and goods, and a suspension of his civil rights as a citizen; and in the second place, it enables the plaintiff in a civil action, to the Court of Exchequer, or by petition, when his claim exceeded 50 £s, to obtain satisfaction of his claim by a sale of the property thus seized. And there is a strong case, as to a judgment of outlawry, cited by the Court in the case of *Mc-Pherson* v. *Corliff et al.*, 11 Serg. & Rawle, 438, to sustain the proceedings of the probate courts, as to the sale of real estate, wherein these proceedings were unsuccessfully attacked on the ground that it had proceeded under a total mistake as to the real parties in interest, the Court having proceeded under the idea that a family of children, who were really bastards, were the heirs of the deceased. The case is cited from 10 Vin. (Title Record, c. pl., 2 from Br. E. pl. 78). " Record of outlawry of divers persons was certified in the Exchequer, among whom one was certified outlawed and was not outlawed, and that his goods forfeited were in the hands of *I. N.*, and upon process made against him he came and said he was not outlawed, and parcel of the record came by chancery out of B. R. into the Exchequer; and *Green*, justice of B. R., came into the Exchequer and said he was not outlawed, but that it was misprison of the clerk. *Skipworth* said, though all the judges would record the contrary, they shall not be credited, when we have recorded that he is outlawed. *Quære*, what remedy is for the party? It seems it is a writ of error, inasmuch as there is no original against him, but only record of outlawry without original. (Br. Record, pl. 49.) And in the same book, pl. 4, cites Br. Error, pl. 78, it is said

the diversity is this, that a man may assign error on a thing separate or out of the record, but he can not falsify it."

In *Scotland,* there seems to have been a practice, in early times, of summoning debtors to pay debts by blowing a horn, out of which practice arose warrants of horning, and judgments of horning were rendered. Touching these judgments the above case from *Arkansas* proceeds: "There is a a case in 4 Bing. 686, (*Douglass et al., assignees,* v. *Forest ex. of Hunter,*) where, in an action in *England,* on one of these judgments of horning, it was contended that the judgment should be held as a nullity, upon the principal of universal justice, as the counsel expressed it, there having been no notice previous to the judgment of horning. But the *English* Court refused to so hold,. and said: 'On this question we agree with the defendant's counsel, that if these decrees are repugnant to the principles of universal justice, this Court ought not to give effect to them. But we think these decrees are perfectly consistent with the principles of justice. If we hold that they were not consistent with the principles of justice, we should condemn some of the proceedings of our own Courts." But see 4 Black. Comm. 283, note. But these are judgments obtained, as we take it, against resident citizens of the State, who may be temporarily concealed or absent, so that actual notice can not be given to them. *Story,* in his Conflict of Laws, shows this. Sec. 557 *et seq.* In *England* the doctrine of expatriation is not admitted, and the absentees remained British subjects. These judgments against citizens may be valid, and enforced by the judicial tribunals of the State where rendered, and might be respected by other States of the Union, under the constitutional provision requiring faith to be given in other States to the judgments of each, because, in these judgments, jurisdiction is legally obtained, though they might or might not be respected by the Courts of foreign nations, who act upon international courtesy, not

Beard et al. *v.* Beard.

upon the binding obligation of law.	See *Jeter* v. *Hewitt et al.*, 22 How. (U. S.) Rep. 352.	Thus, Chief Justice *Marshall*, in *Rose* v. *Himely*, 2 Cond. Rep. 98, says: "Of its own jurisdiction, so far as depends on municipal rules, the Court of a foreign nation must judge, and its decision must be respected. But, if it exercises a jurisdiction which, according to the law of nations, its sovereign could not confer, however available its sentences may be within the dominions of the Prince from whom the authority is derived, they are not regarded by foreign courts.	This distinction is taken upon this principle, that the law of nations is the law of all tribunals in the society of nations, and is supposed to be equally understood by all."

But, notwithstanding a State may authorize its Courts to render personal judgment, upon constructive notice against its citizens, it can not, as we think, authorize such a judgment, upon such notice, against a citizen of another State, resident in such other State, unless such citizen submits himself to the jurisdiction of the Court in which the action against him is instituted, by voluntarily appearing in person or by agent.

Says *Mr. Wheaton:* "The practice which prevails, in some countries, of proceeding against absent parties," [foreigners] "by means of some formal public notice, like that of the *viis et modis* of the Roman civil law, without actual personal notice of the suit, can not be reconciled with the principles of international justice."	Law. Wheat. Int. Law, p. 288. Again, he says, "the judicial power of every State may be extended to all controversies respecting personal rights and contracts, or injuries to the person or property, when the party resides within the territory, wherever the cause of action may have originated."	*Id.* 285.	And again: "The judicial power of every State extends to all civil proceedings *in rem*, relating to real or personal property within the territory."	*Id.* 280.

Beard et al. *v.* Beard.

But a State can not give its laws or jurisdiction an extra-territorial operation upon citizens or property of another State. *Sturgis* v. *Fay*, 16 Ind. 429; *Roche* v. *Washington*, 19 Ind. p. 59; *Eaton and Hamilton, &c., Co.* v. *Hunt et al.*, 20 Ind. 457; and see same vol. p. 492. "The authority of every judicial tribunal, and the obligation to obey it, are circumscribed by the limits of the territory in which it is established." 2 Burge Conff. 1044, cited in 2 Am. Leading Cases, at p. 806.

Now, in the case at bar, *John Beard* was a non-resident, or he was not. If he was a resident of the State, temporarily absent, notice by publication was not authorized by law, and was, therefore, void, under the State law. In such a case, that is, of temporary absence of a resident of the State, notice must be given by leaving a copy of process at his last place of residence. *Johnson* v. *Patterson*, 12 Ind. 471; *Sturgis* v. *Fay, supra.* If he was a non-resident, then the Courts of this State could render no personal money judgment against him, though the judgment for divorce, acting simply upon the contract, and for its dissolution, would be operative. *Wilcox* v. *Wilcox*, 10 Ind. 436, and cases cited. The plaintiff proceeded against *John Beard* as a non-resident, he never submitted to the jurisdiction of the Court, and jurisdiction, therefore, to render the judgment for alimony against him was not obtained. 2 Am. Leading Cases, p. 805, *et seq.*; *Harris* v. *Hardeman*, 14 How. (U. S.) Rep. 334; *Webster* v. *Raid*, 11 *id.* 437; *Williamson* v. *Berry*, 8 *id.* 495. *John Beard* was a non-resident. The right of expatriation exists between the States and the judgment in question would have been worthless in *Kansas*. *Arcy* v. *Ketchum et al.*, 11 How. 165. It ought to be here. It was not obtained by due course of law, with right of jury trial. The judgment against *John Beard* for alimony is reversed, as is also, of consequence, the judgment against the *Indiana Central Railway Co.* How it

would have been, had the attachment formed a part of the original suit for divorce, we have not inquired.

*Per Curiam.*—The judgment is reversed, with costs. Cause remanded.

*Newcomb & Tarkington*, for the appellant.