## F. A. MABEE V. HENRY D. MCDONALD.

No. 2299. Decided April 14, 1915.

1.—Personal Judgment—Constructive Service.

A personal judgment, obtained in one State on service by publication against a citizen of another State not making appearance nor otherwise cited is void; but such service, made in accordance with the laws of the State, is sufficient to confer jurisdiction upon its courts over the person of one of its own citizens, though he was then beyond its limits, and to support a valid personal judgment against him. Fernandez v. Casey, 77 Texas, 452, followed, and all authorities on judgments upon constructive service reviewed. (Pp. 140-179.)

2.—Same—Same—Case Stated.

Defendant, sued upon a promissory note, pleaded the recovery of a previous judgment against him on the same cause of action. Plaintiff replied that such

judgment was not valid because that court had obtained no jurisdiction to render a personal judgment against defendant. When such prior suit was brought and judgment recovered, defendant was a citizen of Texas, then beyond the limits of the State, and he was cited by publication in accordance with the laws of the State (Rev. Stats., 1911, arts. 1874 (1235), 1876 (1237), 1941 (1346), 2026 (1375)), and judgment rendered against him personally as well as for the foreclosure of a lien on land in the State. Held, that such former personal judgment against him was valid; that the note was merged therein; and that plaintiff could not recover a second judgment upon it. (Pp. 140-179.)

Error to the Court of Civil Appeals, Sixth District, in an appeal from Lamar County.

McDonald sued Mabee, and appealed from a judgment for defendant. The judgment being reversed and rendered in appellant's favor, Mabee obtained writ of error.

*Lightfoot, Long & Wortham, G. R. Scott,* and *Boone & Pope,* for plaintiff in error.—On validity of the judgment in cause No. 5468: Northcraft v. Oliver, 74 Texas, 162, 169; Martin v. Burns, Walker & Co., 80 Texas, 676, 678-679; Hambel & Heasty v. Davis, 89 Texas, 256, 258; Iams v. Root, 22 Texas Civ. App., 413, 55 S. W., 411, 412-413; Horst v. Lightfoot, 103 Texas, 643.

On the conclusive effect, on collateral attack, to be. given a judgment rendered upon service by publication: Hardy v. Beaty, 84 Texas, 562, 567; Iams v. Root, 22 Texas Civ. App., 413, 55 S. W., 411, 412.

*Moore & Park* and *H. D. McDonald,* for defendant in error.—On the proposition that the judgment was void: Taliaferro v. Butler, 77 Texas, 578; Maddox v. Craig, 80 Texas, 600; Foote v. Sewall, 81 Texas, 659; Stewart v. Anderson, 70 Texas, 588; Hardy v. Beaty, 84 Texas, 562; Kern Barber Supply Co. v. Freeze, 96 Texas, 513; Brewing Co. v. Hirsch, 78 Texas, 192; York v. State, 73 Texas, 651; Pennoyer v. Neff, 95 U. S., 714; Wilson v. Seligman, 144 U. S., 41; Freeman v. Alderson, 119 U. S., 190; Fowler v. Simpson, 79 Texas, 611; Cooper v. Reynolds, 10 Wallace, 308; Galpin v. Page, 18 Wallace, 350. On the proposition that there was no merger: Bute v. Brainerd, 93 Texas, 137; Black on Judgments, sec. 229 et seq.

MR. JUSTICE HAWKINS delivered the opinion of the court.

McDonald sued Mabee on June 5, 1909, in the County Court of Lamar County, upon a promissory note for $300, besides interest and attorney's fees, alleged to have been executed by him and one Hollon, and to foreclose a lien under a writ of attachment sued out by plaintiff in said suit and levied upon land in Texas as the property of Mabee. Hollon was alleged to be insolvent and was not made a party defendant.

Mabee answered. Among other defenses which were interposed by him he pleaded in bar of plaintiff's action a former judgment recovered on October 3, 1893, by the plaintiff, McDonald, against him and Hollon in cause No. 5468 in the District Court of Lamar County, Texas, for the sum of $431.97; that said judgment was rendered in a suit on the

same note upon which this suit is based, and that the debt evidenced by that note was merged in that judgment, and, therefore, this suit should not be maintained. Said answer alleged that said judgment was against said Mabee and said Hollon, personally, for the amount stated, and against them and their co-defendants in said cause. No. 5468 for foreclosure of a vendor's lien upon certain land in Lamar County, Texas, securing said note; that said judgment has never been appealed from and is valid and final; and that said note and plaintiff's cause of action thereon have long since become merged in said judgment, and the matter is *res adjudicata.*

In response McDonald filed a supplemental petition, alleging, among other things, that at the time of the institution by him of said cause No. 5468 in said District Court said Mabee was a non-resident of the State of Texas, but that, erroneously supposing him to be a resident of said State, plaintiff so alleged in his original petition in said suit, and in pursuance thereof citation in that cause was issued to Lamar County, Texas, for defendant Mabee, but, upon the sheriff's return thereon being made showing Mabee to be out of said State, plaintiff filed an affidavit stating that Mabee was absent from the State of Texas, and praying that he be cited by publication; that such citation was thereupon issued and published according to law, and thereafter, on October 3, 1893, judgment was duly rendered in said cause against defendants Mabee and Hollon for $431.97, the amount of said note, and against all of the defendants for foreclosure of the vendor's lien upon certain land; that the record in said cause No. 5468 shows and that the judgment therein upon its face shows that defendant Mabee had been cited in said cause by publication only, and also shows upon its face that it was rendered upon such service and upon that only, and that Hollon was personally served with process; and that by reason of said facts said judgment is not and never was a personal judgment against said Mabee, and never had any force or effect except as a means of reaching, and enforcing said vendor's lien upon, said land.

In reply to said supplemental petition defendant Mabee filed a supplemental answer, in which he excepted to plaintiff's allegation that Mabee was a non-resident of Texas at the time of the institution of said cause No. 5468, as being an attack upon the judgment therein by evidence outside of the record, and alleged that defendant, Mabee, was a resident of the State of Texas at the institution of said cause No. 5468, and when said affidavit for citation by publication was made, and when said citation was issued and published, and when judgment in said cause was rendered.

This County Court case was tried before the court without a jury, and resulted in a judgment in favor of defendant, Mabee. That court filed its findings of fact and conclusions of law to the effect that said District Court judgment, in cause No. 5468, was a valid judgment, *in personam,* against Mabee.

That trial court found, as facts: That the note sued on in this cause was the identical note which was sued on by the same plaintiff, Mc-

Donald, in cause No. 5468, in the District Court of Lamar County, Texas; that in said cause No. 5468, Mabee was duly cited by publication issued on application and affidavit stating that he was absent from the State of Texas; that he was given no other notice of that suit, and did not enter his appearance therein; and that, as was disclosed upon its face, the judgment against Mabee in that cause was based solely upon said citation by publication.

The trial court further found, as facts, that on March 6, 1891, the date upon which Mabee joined in the execution of said note, he resided in Lamar County, Texas, and so resided up to April, 1892, when he left that county to establish a home at some other place; that his family continued to reside in Lamar County until the spring of 1894, when they left, and have since had their home in the State of Missouri; that in April, 1892, Mabee left Lamar County and the State of Texas, and remained away until November, 1892, when he returned to Lamar County, and remained there during said month of November, when he again left there and went to St. Louis, Missouri, where he remained from January 1, 1893, to January 1, 1894, though his family resided in said Lamar County, whence they removed to St. Louis, Missouri, in the spring of 1894; that from January 1, 1893, to January 1, 1894, Mabee was absent from the State of Texas, but that his family resided in Paris, Lamar County, Texas, during that time, and he claimed said Paris as his residence; and that since the spring of 1894 he and his family have resided in St. Louis, Missouri.

The trial court further found, as facts, that said cause No. 5468 was filed November 30, 1892; that personal citation therein to Mabee and Hollon was issued December 29, 1892, directed to the sheriff or any constable of Lamar County, Texas, returnable to the April, 1893, term, and was returned by the sheriff on December 30, 1892, duly served as to Hollon but not executed as to Mabee, and with the endorsement as to him: "Learned to be out of the State of Texas"; that McDonald's affidavit for citation for publication for Mabee was made and filed and such citation to Mabee by publication duly issued on February 20, 1893, and was duly published; and that the judgment of October 3, 1893, in that cause was against said Mabee personally, as well as for foreclosure of the vendor's lien and sale of said land, and awarded execution, generally, against Mabee and Hollon, in the event the land which was ordered sold should bring less than the amount of the judgment. The findings of fact by the Court of Civil Appeals are to the same effect. All material facts as they were so found by the trial court and by the Court of Civil Appeals are accepted and will be treated by this court as the facts of this case.

Upon appeal to the Court of Civil Appeals for the Sixth Supreme Judicial District of Texas, at Texarkana, that court reversed the judgment of the County Court, and rendered judgment in favor of appellant, McDonald, the decision being by a divided court, the majority opinion being by Associate Justice Levy, and the dissenting opinion

being by Associate Justice Hodges.   McDonald v. Mabee, 135 S. W.,
1089.

McDonald's plea in the County Court, setting up invalidity of said
District Court judgment for lack of sufficient service upon Mabee
therein, constitutes an attack, not upon a judgment of a sister State,
but upon a domestic judgment.   Moreover, it is not a direct, but a
collateral attack, this action having arisen and said plea having been
interposed in a court different from that in which the judgment which
is therein attacked was rendered.   As was well said by Associate Justice
Hodges in said dissenting opinion: "This being an action instituted in
the County Court, any issue questioning the validity of a judgment
rendered in the District Court necessarily presents a collateral, and not
a direct, impeachment.   In a collateral attack the validity of a domestic
judgment must be determined by the record itself, and not by evidence
*aliunde*.   Martin v. Burns, 80 Texas, 679, 16 S. W., 1072; Murchison
v. White, 54 Texas, 82; Treadaway v. Eastburn, 57 Texas, 213; Holt v.
Love, 131 S. W., 857; Hardy v. Beatty, 84 Texas, 562, 19 S. W., 778,
31 Am. St., 80; Horst v. Lightfoot, 103 Texas, 643, 132 S. W., 761.
Hence it follows that the findings of the trial court with reference to
Mabee's residence at the time of the original suit and the publication
of citation, are wholly immaterial and add nothing by way of support-
ing the judgment from which this appeal is prosecuted."   However, in
order that all the facts may be clearly understood, we have thought it
best to set them out at length.

Again, as was pointed out in said dissenting opinion:   "The sit-
uation presented is somewhat peculiar.   The attack upon the validity
of that judgment (referring to the judgment in cause No. 5468) is
made by the plaintiff, the one who presumably would insist upon its
validity, while its validity is asserted by the defendant, the party who
would ordinarily be expected to make the assault.   That peculiarity,
however, will not be considered as affecting the question before the
court."

Plaintiff in error, Mabee, brings this case before us for review upon
six assignments of error.

The sixth assignment complains of the alleged action of the Court
of Civil Appeals in considering the findings of fact by the trial court
concerning the actual place of residence of Mabee, apart from what is
shown upon that point by the record in said cause No. 5468.   It is
true that the opinion of the majority of that court sets out the findings
of fact in question, but we are unable to find that they permitted those
facts to control or even influence their decision in the case.   On the
contrary, as we understand their opinion, they hold, squarely, that upon
the facts disclosed by the record and shown upon the face of the judg-
ment in said cause No. 5468 that judgment was not valid as a personal
judgment against Mabee.   In said opinion they say:   "The facts posi-
tively appearing, as they do, upon the record, any presumption of fact
that would be required to be indulged in a collateral attack upon a judg-
ment here ceases, and the question becomes one of law."   The entire

record of the case, including an affidavit and application for citation by publication, may be considered in aid and support of a' domestic judgment.   Horst v. Lightfoot, 103 Texas, 643, 132 S. W., 761; Hardy v. Beatty, 84 Texas, 562, 31 Am. St., 50, 19 S. W., 778; Iams v. Root, 22 Texas Civ. App., 413, 55 S. W., 411.   Nor have we been able to discover that there is any conflict whatever between the material facts concerning the citizenship, or place of residence, of Mabee, or his absence from the State of Texas, or service upon him, as shown by the record and judgment in said cause No. 5468, and the facts concerning all or any of those features as found by the County Court and by the Court of Civil Appeals in this case.   It is evident, therefore, that even though the majority of the Court of Civil Appeals had considered and relied upon said findings of extraneous facts by the trial court their own decision, in all reason, would have been precisely what it was when predicated upon the facts disclosed by the record, including the judgment, in said cause No. 5468.   We find no merit in said sixth assignment of error, and it is overruled.

The other five assignments of error complain solely of the action of the Court of Civil Appeals in upholding the validity of the judgment of the District Court in said cause No. 5468 as a personal judgment against Mabee, so they will be considered together.

That was the judgment of a duly established court of this State, of general and competent jurisdiction, rendered against an absent citizen of the State of Texas upon citation by publication only, yet in strict compliance with the laws of this State, which provides for such proceedings in personal actions for debt as well as in actions affecting title to or liens upon land.

The record in that cause, including the judgment itself, shows such compliance.

Said judgment was in all respects unquestionably regular, and was valid, as a proceeding in rem, in so far as it related to or concerned and accomplished the subjection of the land which it described to the vendor's lien thereon securing the purchase money note executed by Mabee which was sued upon in that cause and in the cause at bar. Pennoyer v. Neff, 95 U. S., 714, 24 L. Ed., 565; York v. State of Texas, 73 Texas, 651, 11 S. W., 869.   Indeed, this much has been conceded throughout this entire case.

But defendant in error, McDonald, strenuously insists that because, as to Mabee, it was based upon citation by publication only, and he made no personal appearance in the cause in which it was rendered, said judgment was not valid as a personal judgment against Mabee, and, consequently, said note did not merge into said judgment, as contended by Mabee, and said judgment is not a bar to McDonald's action upon said note in the County Court case which is before us. McDonald contends that when said judgment is considered as a purely personal judgment against Mabee the citation by publication upon which, alone, it rests, did not afford to Mabee "due process of law," within

the terms of the Fourteenth Amendment to the Constitution of the United States. Mabee insists that it did. This, then, is the only real issue in the case at bar.

If said citation by publication, under the circumstances, was not in "due course of the law of the land," and did not constitute "due process of law," as an adequate basis for such personal judgment against Mabee, said judgment was indeed invalid as a personal judgment against him, said note did not merge therein, the judgment of the County Court in this cause was erroneous, and the decision of the Court of Civil Appeals therein in favor of McDonald should be upheld.

Conversely, if said citation by publication was in due course of the law of the land, and afforded to Mabee due process of law in regard to the personal action against him; in that cause, for debt, said judgment was valid as a personal judgment against him, the note merged therein, the judgment of the County Court in this cause and the conclusion announced in said dissenting opinion of Associate Justice Hodges are sound, and said decision of the Court of Civil Appeals must be reversed and the judgment of the County Court in favor of Mabee must be affirmed.

The Fourteenth Amendment to the Constitution of the United States declares: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. Nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Article 1, section 19, of the Constitution of Texas is as follows: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

The Revised Statutes of Texas, adopted in 1911, title 37, contain the following provisions relative to citation by publication from the District and County Courts of this State, and review of judgments based thereon, which statutory provisions, substantially, have all been in force since prior to the filing of said District Court cause No. 5468:

"Art. 1874 (1235) (1235). Citation by publication.—Where any party to the suit, his agent or attorney, shall make oath at the time of instituting the suit, or at any time during its progress, that the party defendant is a non-resident of the State, or that he is absent from the State, or that he is a transient person, or that his residence is unknown to the affiant, the clerk shall issue a citation for the defendant, addressed to the sheriff or any constable of the county in which the suit is pending. Such citation shall contain a brief statement of the cause of action, and shall command the officer to summon the defendant by making publication of the citation in some newspaper published in his county, if there be any newspaper published therein, but if not, then in any newspaper published in the judicial district where the suit is

pending; but if there be no newspaper published in such judicial district, then it shall be published in the nearest district to the district where the suit is pending. Such citation shall be published once in each week for four consecutive weeks previous to the return day thereof. (Acts March 16, 1848, p. 106, sec. 13; March 15, 1875, p. 170, sec. 1. Acts 1879, ch. 96, p. 103. P. D., 25.)"

Article 1876 (1237) (1237) provides, in substance, that such citations shall contain the requisites prescribed by the statute for ordinary citations.

"Article 1941 (1346) (1212, 1345). Procedure in case of service by publication where no answer, etc.—Where service of process has been made by publication, and no answer has been filed nor appearance entered within the time prescribed by law, the court shall appoint an attorney to defend the suit in behalf of the defendant, and judgment shall be rendered as in other cases; but, in every such case, a statement of the evidence, approved and signed by the judge, shall be filed with the papers of the cause as part of the record thereof. The court shall allow such attorney a reasonable compensation for his services, to be taxed as part of the costs of the suit (Acts 1846, p. 363, sec. 128. Acts 1866, p. 125, sec. 1, P. D. 1488, 26.)"

That all the proceedings in said cause No. 5468 were in full compliance with these statutes has not been questioned but is admitted.

"Article 2026 (1375) (1373). Bill of review in suits by publication. —In cases in which judgment has been rendered on service of process by publication, where the defendant has not appeared in person or by an attorney of his own selection, a new trial may be granted by the court upon the application of the defendant for good cause shown, supported by affidavit, filed within two years after the rendition of such judgment. (Id. sec. 129, P. D. 1489.)"

All of the foregoing statutory provisions should be considered together, upon the issue before us. Flint River Steamboat Co. v. Foster, 5 Ga., 194, 48 Am. Dec., 248; Corliss v. Corliss, 8 Vt., 373. See, also, dissenting opinion of Mr. Justice Hunt in Pennoyer v. Neff, 95 U. S., 736, and references therein to similar statutes in various States.

In construing the Thirteenth and Fourteenth Amendments, for the first time, in the Slaughter House Cases, 16 Wall., 67, the Supreme Court of the United States said:

"We do not conceal from ourselves the great responsibility which this duty devolves upon us. No questions so far reaching and pervading in their consequences, so profoundly interesting to the people of this country, and so important in their bearing upon the relations of the United States, and of the several States to each other and to the citizens of the States and of the United States, have been before this court during the official life of any of its present members."

Very often, since then, that court has been called upon to exercise its jurisdiction under that "due process" clause. Thirty-seven years ago, with reference to it, that court was moved to declare:

"In fact, it would seem, from the character of many of the cases before us, and the arguments made in them, that the clause under consideration is looked upon as a means of bringing to the test of the decision of this court the abstract opinions of every unsuccessful litigant in a State court of the justice of the decision against him, and of the merits of the legislation on which such a decision may be founded." Davidson v. New Orleans, 96 U. S., 104, 24 L. Ed., 616.

That clause in the Fifth and Fourteenth Amendments has aptly been termed "those last resorts of desperate cases." Commonwealth v. Phila., etc., Coal Co., 145, Pa. St., 286, 23 Atl., 809.

Withal, so far as has been pointed out to us, or we have been able to find, the precise question which the case at bar presents,—the question as to the authority of a court of a State to bind one of its absent citizens by a personal judgment based upon constructive service by publication only—has never been decided by that tribunal.

No useful purpose would be subserved, perhaps, by entering here upon an exhaustive discussion of the definition, purpose, legal meaning and application of "due process of law," as that expression is employed in the Fourteenth Amendment. However, the question immediately before us is one of great importance; the decisions of courts of last resort in several States conflict thereon, and in several of them, as in the case at bar in the Court of Civil Appeals, vigorous and able dissenting opinions have been filed; the decisions of even the Supreme Court of the United States upon questions relating to the sufficiency and validity of constructive or substituted service present great divergence of views and also numerous dissenting opinions; the opinions of this court bearing upon the point here involved have dealt with it but briefly; and by reason of these facts, collectively, we feel impelled to make at least a general survey of that field.

Magna Charta, which was wrung from King John by the barons, the clergy and the commoners of England, in 1215, was based upon several earlier charters from sovereigns of England, ranging back to one granted by William of Normandy, and was designed to restore to the people of England various rights and privileges of life and property which had been ruthlessly usurped by the reigning sovereign.

That unchaptered original Great Charter, which, several times thereafter, was reissued in amended form, contained this guaranty: "No freeman shall be taken or imprisoned, or disseised, or outlawed, or exiled, or anywise destroyed; nor shall we go upon him, nor send upon him, but by the lawful judgment of his peers, or by the law of the land." Stubbs, 1 Const. Hist. Eng., 577; Chap. 29, Magna Charta of 9 Hen. III. "Law of the land," in that historic and precious document probably related back to established rights and usages which that people had previously enjoyed, in contradistinction to Roman or civil law (James v. Reynolds' Adm'rs, 2 Texas, 250; Kalloch v. Superior Ct., 56 Calif., 229, Coke, Inst. 2, 46), and also emphasized the distinction between trial by wager of battle or by ordeal and trial by one's peers. Pomeroy's Const. Law, sec.

245.  But in both England and America that clause has been given a different and much broader meaning, as we shall presently see.  McGehee, in his work on "Due Process of Law," traces, through the mutations of Magna Charta and various English statutes of the fourteenth century and the constitutional contests of the seventeenth century, the evolution of "law of the land" into "process of law" and "due process of law," and in so doing says of Magna Charta: "Such a document, looked to by each succeeding generation as a living guaranty of rights, is naturally interpreted in each age according to the needs of the time.  The broad construction which was given to the thirty-ninth chapter by the statesmen and lawyers of the seventeenth century during the constitutional struggles with the Stuarts, became fixed in the commentaries of Coke and subsequent writers, and in the period of our Revolutionary War was woven into the very texture of American constitutional law."  The reference is to the said portion of another reissue of Magna Charta.

In addressing the Georgia Bar Association in 1903, Chief Justice Alton B. Parker, of the New York Court of Appeals, said:  "In a work upon the Fourteenth Amendment of the Constitution of the United States, published but a few years ago, it is stated that the words 'due process of law' were probably first used in the Petition of Right of Charles I., A. D. 1628, whereas the fact is that in chapter 3 of the Statutes of 28 Edward III., passed 274 years before the Petition, and entitled, 'None shall be condemned without Trial,' we find that no man 'shall be put out of Land or Tenement, nor taken, nor imprisoned, nor disinherited, nor put to Death, without being brought to answer by *due Process of Law.*  .  .  . While the pharse came to us from England it is far more potential under our system of governmtnt than it is or ever was in England.  There it restrained the King, not parliament.  Here it operates upon every department of Federal and State government—executive, legislative and judicial."  (American Law Review, vol. 37, No. 5, p. 41.)

The phrase "due process of law" had no place in the Constitution of the United States as adopted in 1787.  It first found its way into the Fifth Amendment, which was adopted in 1798.  More than seventy years later, in 1868, it was incorporated in the Fourteenth Amendment.  The same expression, or some words of similar import, such as "due course of the law of the land," have been embodied in the Constitution of almost every American State.  The Fourteenth Amendment radically restricted the powers of the States and correspondingly extended the jurisdiction of the Supreme Court of the United States.  It clothed that high tribunal with ultimate authority to determine and declare whether or not any particular statute of any State affecting life, liberty or property, does or does not constitute a denial of "due process of law" within the scope and meaning of that amendment.  Decisions of any and all other courts upon that question, therefore, are valuable merely as side-lights.

"Due process of law," as used in the Fourteenth Amendment, and "due course of the law of the land," as used in article 1, section 19 of the Constitution of Texas, and in the constitutions of many of her sister

States, according to the great weight of authority, are, in nearly if not all respects, practically synonymous. Murry's Lessee v. Hoboken Land and Improvement Co., 18 How., 272, 15 L. Ed., 372; Walker v. Sauvinet, 92 U. S., 90, 23 L. Ed., 378; Hurtado v. California, 110 U. S., 523, 28 L. Ed., 232, and authorities cited; McGehee's Due Process of Law, pp. 10-35; 8 Cyc., 1081, closing par. of note 59, and 1083, note 63; Words and Phrases, vol. 3, p. 2228.

The general purpose of the expression "due process of law" in the Fourteenth Amendment was to prevent encroachment by the States against life, liberty and property, just as the purpose of that identical phrase in the Fifth Amendment was to prevent such encroachments by the National government. Hibben v. Smith, 191 U. S., 325, 48 L. Ed., 195.

"Due process of law" has been variously defined and treated, as follows: "An exertion of the power of government as the settled maxims of the law permit and sanction, and under such safeguards for the protection of individual rights as these maxims prescribe for the class of cases to which the one in question belongs." Cooley's Const. Lim., 356; Beyman v. Black, 47 Texas, 571; Gulf, C. & S. F. Ry. Co. v. Ellis, 18 S. W., 723.

"By the 'law of the land' is clearly intended the general law, which hears before it condemns, which proceeds upon inquiry and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society." Webster, in argument in Dartmouth College v. Woodward, 4 Wheat., 518, 4 L. Ed., 629; Grigsby v. Peak, 57 Texas, 142; U. C. Ins. Co. v. Chowning, 86 Texas, 654, 24 L. R. A., 524, 26 S. W., 982; Armstrong v. Traylor, 87 Texas, 601, 30 S. W., 440; Wichita Elec. Co. v. Hinckley, 131 S. W., 1192; Words and Phrases, vol. 3, p. 2232.

"Law in its regular course of administration through courts of justice." Chancellor Kent, 2 Com., 13, citing Story on Const., vol. 3, 264, 661; 8 Cyc., 1081, note 59; Words and Phrases, vol. 3, p. 2236.

"A course of legal proceedings according to those rules and principles which have been established in our system of jurisprudence for the protection and enforcement of private rights." Pennoyer v. Neff, 95 U. S., 733, 24 L. Ed., 565. This definition has been very generally approved. Words and Phrases, vol. 3, p. 2234; Gulf, C. & S. F. Ry. Co. v. Ellis, *supra*.

"In all cases that kind of procedure is due process of law which is suitable and proper to the nature of the case and sanctioned by the established customs and usages of the courts." Ex parte Wall, 107 U. S., 289, 27 L. Ed., 572.

"Any process known to the law, criminal or civil, at the time when the provision was adopted. . . . The inhibitions of the Constitution which prohibit Congress from any material change of processes known to the jurisprudence of England and the United States at the time of their adoption must be understood to be confined to those that would affect

the people's rights to life, liberty and property as then existing, and not to cripple Congress in any proposed changes not affecting those rights." Waples' Proceedings in Rem., pp. 26, 28.

"It is sufficient if a kind of notice is provided by which it is reasonably probable that the party proceeded against will be apprised of what is going on against him, and an opportunity is afforded him to defend." Note to Flint River Steamboat Co. v. Foster (Ga.), 48 Am. Dec., 272; Matter of Empire City Bank, 18 N. Y., 200; Rockwell v. Nearing, 35 N. Y., 202.

"Due process of law does not necessarily mean that the person affected thereby should have personal notice of the proceeding. Either actual or constructive notice is sufficient, and answers every purpose of the law, if it be reasonably probable that he will be apprised of the proceeding." State v. Dist. Ct. St. L. Co., 90 Minn., 457, 97 N. W., 132, citing Cooley's Const. Lim., 6th ed., 497, note 1; 10 Am. & Eng. Ency. L., 2nd ed., 299; Mason v. Messenger, 17 Iowa, 261; Happy v. Mosher, 48 N. Y., 313.

"One which, following the forms of law, is appropriate to the case, and just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and whenever it is necessary for the protection of the parties, it must give them an opportunity to be heard respecting the justice of the judgment sought. The clause in question means, therefore, that there can be no proceeding against life, liberty or property which may result in the deprivation of either, without the observance of those general rules established in our system of jurisprudence for the security of private rights." Hagar v. Reclamation District, 111 U. S., 708, 28 L. Ed., 569, citing Hurtado v. California, 110 U. S., 516, 28 L. Ed., 232.

Various courts have held that "due process of law" means such general legal forms and course of procedure as were either known to the common law, or as were generally recognized in this country at the time of the adoption of the Constitution. But many other courts have held that rule too restrictive. Brown v. Levee Com'rs, 50 Miss., 468.

In Murray's Lessee's Case, 18 How., 272, 15 L. Ed., 372, the Supreme Court of the United States prescribed this test: "We must examine the Constitution itself to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England before emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted upon by them after the settlement of this country."

In Hurtado's Case, 110 U. S., 529, after quoting as above from the case last mentioned, the court said: "This, it is argued, furnishes an indispensable test of what constitutes 'due process of law'; that any proceeding otherwise authorized by law, which is not thus sanctioned by usage, or which supersedes and displaces one that is, can not be regarded as due process of law. But this inference is unwarranted. The real syllabus of the passage quoted is, that a process of law, which is not

otherwise forbidden, must be taken to be due process of law, if it can show the sanction of settled usage both in England and in this country; but it by no means follows that nothing else can be due process of law. The point in the case cited arose in reference to a summary proceeding, questioned on that account, as not due process of law. The answer was: however exceptional it may be, as tested by definitions and principles of ordinary procedure, nevertheless, this in substance, has been immemorially the actual law of the land, and therefore, is due process of law. But to hold that such a characteristic is essential to due process of law, would be to deny every quality of the law but its age, and to render it incapable of progress or improvement. It would be to stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and Persians."

And in the same opinion, in referring to the "broad and general maxims of liberty and justice," the court said: "Applied in England only as guards against executive usurpation and tyranny, here they have become bulwarks also against arbitrary legislation; but, in that application, as it would be incongruous to measure and restrict them by the ancient customary English law, they must be held to guarantee not particular forms of procedure, but the very substance of individual rights to life, liberty and property." That opinion also speaks of "due process of law," as used in the Fourteenth Amendment, as "that law of the land in each State which derives its authority from the inherent and reserved power of the State, exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." And after quoting approvingly from Brown v. Levee Commissioners, 50 Miss, 468, wherein it was said with reference to "due process of law," "It refers to certain fundamental rights which that system of jurisprudence, of which ours is a derivative, has always recognized," and from Loan Association v. Topeka, 20 Wall., 655, 28 L. Ed., 455, wherein it was said: "It must be conceded that there are such rights in every free government beyond the control of the State. A government which recognized no such rights, which held the lives, the liberty, and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depository of power, is, after all but a despotism," that court of last resort in such cases thus prescribed the test: "It follows that any legal proceeding enforced by public authority, whether sanctioned by age and custom, or newly devised in the discretion of the legislative power, in furtherance of the general public good, which regards and preserves these principles of liberty and justice, must be held to be due process of law."

In another case that court said:

"This court has said that a trial in a court of justice, according to the modes of proceeding applicable to such a case, secured by laws operating on all alike, and not subjecting the individual to the arbitrary exercise of the powers of government unrestrained by the established principles of private right and distributive justice—the court having jurisdiction of

the subject matter and of the parties, and the defendant having full opportunity to be heard—met the requirement of due process of law. United States, Cruikshank, 92 U. S., 542, 554, 23 L. Ed. 558; Leeper v. Texas, 139 U. S., 462, 468, 35 L. Ed., 225." Chi. B., etc., v. Chicago, 166 U. S., 234, 41 L. Ed., 979.

"Due process of law, as the meaning of the words have been developed in American decisions, implies the administration of equal laws according to. established rules, not violative of the fundamental principles of private right, by a competent tribunal having jurisdiction of the case and proceeding upon notice and hearing." McGehee's Due Process of Law, p. 1.

"It seems impossible to give a definition which is at once perspicuous and satisfactory." Hodge v. Muscatine County, 121 Iowa, 482, 67 L. R. A., 624, 104 Am. St., 304, 96 N. W., 968.

"It must be confessed, however, that the constitutional meaning or value of the phrase "due process of law" remains today without that satisfactory precision of definition which judicial decisions have given to nearly all the other guarantees of personal rights found in the Constitutions of the several States and of the United States." . . .

"If therefore, it were possible to define what it is for a State to deprive a person of life, liberty, or property without due process of law, in terms which would cover every exercise of power thus forbidden to the State, and exclude those which are not, no more useful construction could be furnished by this or any other court to any of the fundamental laws.

"But, apart from the imminent risk of a failure to give any definition which would be at once perspicuous, comprehensive, and satisfactory, there is wisdom, we think, in the ascertaining of the intent and application of such an important phrase in the Federal Constitution, by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded." Davidson v. New Orleans, 96 U. S., 101, 24 L. Ed., 616.

In many early cases, in various States, it was held that a personal judgment against a non-resident, based solely upon constructive or substituted service, conformably to a State statute, was valid for all purposes within the State in which judgment thereon was rendered, even though such judgment was not valid, or entitled to recognition, in a sister State.

Wheeler, J., said, in McMullen v. Guest, 6 Texas, 279: "The plaintiff is a resident of the State, and is entitled to the process of the court to protect and enforce his legal rights against a non-resident whose person or property he may find subject to that process. He may sue the non-resident as a 'transient person,' under the provision of the first section of the Act of 1846 (Hart. Dig., p. 241), if found temporarily sojourning here; and if not to be so found, the object of the statute under which this suit was brought doubtless was to enable him to sue and obtain service by publication. The non-residence of the defendant constitutes no objection to the jurisdiction, however, the judgment might

be regarded if sought to be enforced in a foreign State. (Story on Conf. of Laws, sec. 539, 540, 548, 549, and notes; 9 Mass. R., 466.)"

To the same effect was Campbell v. Wilson, 6 Texas, 389, wherein it was declared that the doctrine of international law under which service upon a non-resident by means of attachment upon property with the State should be treated to all intents and purposes as a proceeding *in rem* and will not support a personal judgment to the extent of reaching beyond the property attached, must yield, at least within such State, to the superior force of a conflicting statute; but in that instance the defendant had subjected his person to the jurisdiction of the court by appearing and answering to the merits.

And in Thouvenin v. Rodrigues, 24 Texas, 477-8, it was said: "Whatever effect may be given to the judgments of one State, when sought to be enforced in the courts of another, however they may be regarded in the courts of the latter State, when rendered without personal service on the defendant, it is perfectly well settled, that if rendered upon constructive service, authorized by the laws of the State where rendered, they will be held to be as valid and binding by its courts, to the extent of their operation by the local law, as if rendered upon personal service on the defendant. It is competent for each State to prescribe the mode of bringing parties before its courts. Although its regulations in this respect can have no extra-territorial operation, they are, nevertheless, binding on its own citizens. For, in respect to its own resident citizens, it is undoubtedly competent for the legislature to prescribe such modes of judicial proceeding as it may deem proper, to direct the manner of serving process; the notice which shall be given to defendants; and to declare the effect of a judgment rendered in pursuance of such notice." Freeman on Judgments, sec. 567.

But the view that the same judgment might be valid in one and invalid in another State was untenable on principle, and sems to have been abandoned, generally, in view of what was held and said in Pennoyer v. Neff, 95 U. S., 714, 24 L. Ed., 565, decided in October, 1877. Barkman v. Hopkins, 11 Ark., 157.

That the judgments of each State shall have the same force and effect in other States was provided, in substance by the Constitution of the United States, article IV, sec. 1, and by the Act of Congress of May 26, 1790. But those provisions were not designed to prevent inquiry into either the jurisdiction of the court or the right of the State authority over the person or the subject matter. D'Arcy v. Ketchum, 11 How., 165, 13 L. Ed., 648; Barkman v. Hopkins, 11 Ark., 157, and cases cited; Story on Const., 175, 178, 183.

The effect of the D'Arcy case was that if the court of the sister State found that the non-resident defendant had been personally served in the State in which judgment was rendered, with statutory process, it was required to uphold the personal judgment; but, if it found that the defendant had not been so personally served, and had not submitted himself to the jurisdiction, it was under no obligation to recognize such

judgment as·valid. See also Thompson v. Whitman, 18 Wall., 460, 21 L. Ed., 897; Knowles v. Guslight and Coke Co., 19 Wall., 61, 22 L. Ed., 70; Lafayette Ins. Co. v. French, 18 How., 404, 15 L. Ed., 451.

Long prior to Pennoyer v. Neff, and prior to the adoption of the Fourteenth Amendment, various State courts and the Supreme Court of the United States itself had held that no purely personal judgment against a non-resident could be predicated upon any character of constructive service, without personal appearance. D'Arcy v. Ketchum, *supra;* Barkman v. Hopkins, *supra,* and authorities cited; Dearing v. Bank of Charlestown, 5 Ga., 497, 48·Am. Dec., 300; Beard v. Beard, 21 Ind., 327.

All those decisions but followed and applied the tenets and principles of natural justice and the general rule of the common law, and, indeed, of international law.

Wheaton, in his work on International Law, says, at p. 288:

"The practice which prevails, in some countries, of proceeding against absent parties" (foreigners), "by means of some formal public notice, like that of the *viis et modis* of the Roman civil law, without actual personal notice of the suit, can not be reconciled with the principles of international justice." Yet he says the judicial power of every State extends to "all civil proceedings *in rem,* relating to real or personal property within the territory," Id. 280, and to "all controversies respecting personal rights and contracts, or injuries to the person or property, when the party resides within the territory, wherever the cause of action may have originated." Id. 285. Burge, in his Commentaries on Colonial and Foreign Law, p. 1044, tells us: "The authority of every judicial tribunal and the obligation to obey it are circumscribed by the limits of the territory in which it is established."

Story, in his Conflict of Laws, sec. 539, declares:

"No sovereignty can extend its process beyond its own territorial limits, to subject either persons or property to its judicial decisions. Every exertion of this sort beyond this limit is a mere nullity, and incapable of binding such persons or property in any other tribunals." And in Picquet v. Swan, 5 Mason, 40, he said: "The courts of a State, however general may be their jurisdiction, are necessarily confined to the territorial limits of the State. Their process can not be executed beyond those limits; and any attempt to act upon persons or things beyond them would be deemed a usurpation of foreign sovereignty, not justified or acknowledged by the law of nations. Even the Court of King's Bench, in England, though a court of general jurisdiction, never imagined that it could serve process in Scotland, Ireland, or the colonies, to compel an appearance, or justify a judgment against persons residing therein at the time of the commencement of the suit."

That doctrine is tersely stated thus in Dearing v. Bank, 5 Ga., 497, 48 Am. Dec., 313: "The rule is firmly fixed that no sovereignty can extend its process beyond its territorial limits, to subject either persons or property to its judicial decisions. This is the rule by the law of nations—by

the common law, and is recognized by the American courts. Dig., lib. 2, tit. 1, 1, 20; 1 Boullenois' Pr. Gen. 1, 2, pp. 2, 3; Vattel, b. 2, c. 8, sec. 84; Picquet v. Swan, 5 Mason, 35, 42; Story's Conf. L., 450, sec. 539."

In discussing the above mentioned Act of Congress, relating to judgments, the Supreme Court of the United States said, in 1850: "International law, as it existed among the States in 1790 was, that a judgment rendered in one State, assuming to bind the person of a citizen of another, was void within the foreign State, when the defendant had not been served with process or voluntarily made defence, because neither the legislative jurisdiction, nor that of courts of justice, had binding force." D'Arcy v. Ketchum, *supra.*

As to the common law:

In violation of the principles of the "law of the land," as embodied in Magna Charta, parliament, at various times, passed confiscatory acts, such as bills of attainder and bills of pains and penalties, against distinguished personages, resulting in much ill-feeling and bitterness among the people.

Among them may be mentioned the act exiling and disinheriting the Despencers, which a later parliament reversed upon the ground that "said award was made without calling them to answer, and without the assent of the prelates, which are peers in the realm in parliament, and against the Great Charter of the franchises of England"; the Act against the Earl of Arundel, and the Act against Roger, Earl of Mortimer, each of which was likewise reversed, upon similar grounds. In the fourteenth century attainders of treason were common, as "a device of the dominant faction to secure forfeiture of estates." The Duke of Gloucester, Cromwell, and others were attainted, after death, as were Lord Edward Fitzgerald and others by the Irish Parliament in 1798. Other such acts were those against the Countess of Salisbury, Lord Admiral Seymour, and Sir John Fenwick, respectively. Among notable bills of pains and penalties were those against the Bishop of Atterbury, and Queen Caroline, respectively. McGehee, Due Process of Law, Ch. 2.

While it is true that in article 1, sections 9 and 10 of the Constitution of the United States specific provision is made against the passage of any bill of attainder whatever, by the Congress or by any State legislature, we may well assume that it was at least in contemplation of those signal acts in violation of the ancient "law of the land" in England, and probably, ·partly, as an additional safeguard against such legislative experiences in this country, without notice to the victim, that the "due process" clauses of said Fifth and Fourteenth Amendments were adopted.

In early English history the blood-feud afforded the only means of redress for injuries. It was largely supplanted by the custom of voluntarily referring the controversy to an arbitrator for award of damages. Jenks, Law and Politics in Middle Ages, 100, et seq.; Maine, Ancient Law, 3rd Am. Ed., 364; Holmes, Com. Law, 3.

The ancient principle of the common law, which forbade judgment

against any one until he had personally appeared (2 Poll. & M. Hist., 592, Blackstone's Comm., Bk. 4, 283), is, perhaps, but the impress of that voluntary practice.

After courts were established by law, the theory which prevailed was that consent of the defendant was indispensable to the jurisdiction; and appearance in private actions evidenced consent. McGehee, Due Process of Law, Chap. 3. The effort of the government to compel, by process, such consent by appearance resulted in providing for the circumlocutory proceedings of outlawry, which involved first, a judicial sentence of qualified forfeiture of the defendant's lands and goods, and a suspension of his civil rights as a citizen, and, second, a civil action to the Court of Exchequer, or by petition, when the claim exceeded 50 pounds, resulting in satisfaction of such claim by sale of property so seized. Allowed, originally, in cases of felony only, that proceeding was extended to actions for trespass *vi et armis,* and, in the times of the Henrys, III and VII, and of the Edwards, I and III, to various civil actions. Blackstone, book 3, ch. 19.

In proceedings of outlawry the practice with regard to an absconding debtor was to issue, if necessary, successive writs, *original, capias, alias, and pluries,* and if all were returned *non est inventus,* to issue the *exigent,* or *exigi facias,* which required the sheriff "to cause the defendant to be proclaimed, required, or exacted, in five county courts successively, to render himself; and, if he does, then to take him as in a *capias*": but if he did not appear, and was returned *quinto exactus,* he was then outlawed by the coroners of the county. By statutes 6 Hen. VIII, c. 4, and 31 Eliz., c. 3, there was issued, with the *exigent, a writ of proclamation* under which the sheriff of the county of the defendant's residence was required "to make three proclamations thereof in places the most notorious and most likely to come to his knowledge" a month before the outlawry: 3 Blackstone, ch. 19. In Tynte v. The Queen in 1845, Lord Denman being Chief Justice, a judgment of outlawry was reversed, after the lapse of one hundred and sixteen years, because the record failed to show that proclamation had been made, or a writ of proclamation issued, as required by statute. Eng. C. L. Rep. A. & E. N. S., vol. 7, p. 216.

Statutes authorizing service by publication have frequently been held to be in derogation of common law, resulting in the necessity of following them strictly, in order to acquire jurisdiction thereunder. Galpin v. Page, 18 Wall., 50, 21 L. Ed., 959, and cases cited.

Alderson, in Judicial Writs and Process, p. 313, tells us: "All constructive or substituted service of process must, to be effectual, be authorized by statute. It is a manner of serving process unknown to the common law."

His first proposition has generally been acted upon by the courts of this country as sound, although in a proceeding *in rem,* in Grasmeyer v. Beeson, 13 Texas, 524, it was held that if the Act of 1840 operated repeal of a statute which provided for substituted service "it was competent for the courts, as matter of practice, to adopt a mode of making

parties where the law prescribed none," citing Kegans vs. Alcorn, 9
Texas, 25.

But in stating his second proposition Mr. Alderson probably goes too
far—and he certainly does unless he refers to only the ancient and con-
suetudinary law of England, unaffected by known Acts of Parliament.
Grigsby v. Reib, 105 Texas, 597, 153 S. W., 1124; Browning v. Brown-
ing, 3 N. M. (Johns.), 371, 9 Pac., 682.

In England, by way of exceptions to the general rule which required
personal appearance of the defendant in both criminal and civil actions,
various statutes, from time to time authorized, and the English courts
customarily upheld the validity of, various forms of substituted or con-
structive service.

The Supreme Court of Minnesota said: . "Although service by publica-
tion is of modern origin, there has always been some mode by which
jurisdiction has been obtained at common law by something amounting
to or equivalent to constructive service, where the defendant could not be
found and served personally." Bardwell v. Collins, 44 Minn., 97, 20,
Am. St., 547, 9 L. R. A., 152, 46 N. W., 315.

Ordinarily, "at common law, the process, or means of compelling the
defendant to appear in court was: 1. Summons. 2. The writ of
attachment, or *pone,* which is sometimes the first or original process. 3.
The writ of *distringas,* or distress infinite. 4. The writs of *capias ad
respondentum* and *testatum capias;* or, instead of these, in the King's
Bench, the bill of Middlesex, and writ of *latitat;* and in the Exchequer,
the writ of *quo minus.* 5. The *alias* and *pluries* writs. 6. The
exigent or writ of *exigi facias,* proclamations and outlawry." Mason v.
Messenger & May, 17 Ia., 266, citing 3 Blackstone's Comm., 279, et seq.

With regard to the summons, Blackstone says: "It is a warning to
appear in court at the return of the original writ, given to the defendant
by two of the sheriff's messengers . .. . either in person or left at his
house or land," and that "warning on the land is given, in real actions,
by erecting a white stick or wand on the defendant's grounds (which
stick or wand among the northern nations is called the *baculus nuncia-
torious*) ; and by statute 31 Eliz., c. 3, the notice must also be proclaimed
on some Sunday before the door of the parish church. The writ of
*distringas,* he tells us, "is a subsequent process issuing from the court
of common pleas, commanding the sheriff to distrain the defendant from
time to time, and continually afterwards by taking his goods and the
profits of his lands, which are called issues, and which by the common
law he forfeits to the King if he doth not appear." He adds: "But now
the issues may be sold, if the court shall so direct, in order to defray
the reasonable cost of the plaintiff. In like manner, by the civil law,
if the defendant absconds, so that the citation is of no effect, '*mittitur
adversarius in possessionem bonorum ejus.*' And here by the common,
as well as the civil law, the process ended in case of injuries without
force; the defendant, if he had any substance, being gradually stripped
of it all by repeated distresses, till he rendered obedience to the King's

writ; and if he had no substance the law held him incapable of making satisfaction, and therefore looked upon all farther process as nugatory."

However, in cases of injuries by force, there was allowed the further process of the *capias,* and that writ came into later use in various civil actions of *account, debt* and *detinue,* and in all *actions on the case.* The *capias* called for bringing the body of the defendant into court.

The bill of Middlesex corresponded to the *capias,* and was designed to bring the defendant before the Court of King's Bench at Winchester, upon an accusation of trespass, real or supposed, so that, being before the court, he might be prosecuted for any other species of injury. If returned not served there was then issued the *latitat,* which authorized the sheriff of another county named therein to bring defendant's body into court.

In the exchequer the original writ was the *quo minus* which alleged that the plaintiff was the King's farmer or debtor, and that the defendant had injured him, *"quo minus sufficiens existit,* by which he is the less able to pay the King his rent or debt;" and thereupon the defendant was arrested, "as upon a *capias* from the common pleas." 3 Blackstone, ch. 19.

In a case under statute 6 and 7, Vict., c. 76, Lord Chief Justice Cockburn, in 1864, declared British subjects subject to the criminal laws of England, no matter where the offense was committed. *In re* Tivnan, 5 B. & S., 679.

In Douglas v. Forrest, Executor, 4 Bing., 693, 1 Moore & Payne, 663, decided in 1828, it was held that *assumpsit* lies in the courts at Westminster on a Scotch decree, obtained against a native born Scotchman who *was absent* in India, for a debt contracted in Scotland, although the absentee was cited only by "winding a horn" and summoning him at the market cross at Edinburgh and pier and shore of Leith, in compliance with the statute, 54 Geo., 3, c. 137.

In so deciding Lord Chief Justice Best said: "Can we say that a practice which the Legislature of the United Kingdom has recognized, and extended to other cases, is contrary to the principles of justice? A natural born subject of any country, quitting that country, but leaving property under the protection of its laws, even during his absence owes obedience to those laws, particularly when they enforce a moral obligation." And he added: "We confine our judgment to a case where the party owed allegiance to the country in which the judgments are given against him, from being born in it, and by the laws of which country his property was, at the time these judgments were given, protected; and where debts were contracted in the country in which the judgments were given, whilst the debtor resided in it." See, also, Buchanan v. Rucker, 9 East, 192.

Of a similar statute, the Act of 5 Geo. II, the Supreme Court of Georgia said, in 1848: "It applies alone to the subjects of Great Britain, and, adopted by us, it applies alone to the citizens of Georgia." Dearing v. Bank, 5 Ga., 497, 48 Am. Dec., 300.

.It was said by an English court, in 1831:

"That a law of a British colony that in a suit instituted against an absent party the process should be served upon the King's attorney general in the colony, it not being expressly provided that the attorney general 'should communicate with the absent defendant, was not so contrary to natural justice as to render void a judgment obtained against a party who had resided within the jurisdiction of the court at the time when the cause of action accrued, but had withdrawn himself before the proceedings were commenced." Becquet v. McCarthy, 2 B. & Ad., 951, 22 E. C. L., 220.

For the provisions of various Acts of Parliament authorizing judgments upon substituted or constructive service where the defendant was out of the realm, even though he had not absconded to avoid service, see Daniell's Pleading and Practice of the High Court of Chancery (Perkins ed.). Ch. 8.

Upon such fictions and through such persuasive measures were the English courts accustomed to secure the personal appearance of defendants, or, failing that, to render judgment nevertheless.

Following the English precedents, statutes providing for some form of `substituted or constructive service, most often by publication, have been generally enacted in this country. See dissenting opinion in Pennoyer v. Neff, 95 U. S., pp. 738, et seq., 24 L. Ed., 565, and other cases herein cited.

Grasmeyer v. Beeson, 13 Texas, 528 (decided in 1855), was an action in trespass to try title and for partition of land, under allegations that the defendant was "absent, in parts unknown." Citation by publication was made by order of the court, possibly in the absence of a statute authorizing it. A curator was appointed, presumably before the repeal of the Spanish law which authorized it. He was cited, appeared and answered, and pursuant to the laws of the State of Coahuila and Texas (Decree 277, art. 98), a guardian *ad litem* was appointed. In upholding the decree of partition therein Wheeler, J., said:

"By the Spanish law in force previous to the adoption of the common law (Partidas, 3, 2, 12; 6 M. R. N. S., 17), if a debtor was in captivity or absent, his creditors might require that a curator be appointed, against whom suits might be instituted. (And see note 2 of the Commentaries of Gregoria Lopez on L. 14. Tit. 14, Partidas 3; Escriche. Diccionario, *Verbo Ansente.*)"

"Neither the common law nor any statute of the Republic afforded a remedy in cases like the present as a substitute for that given by the previously existing law. In the common law practice the appearance of the defendant might be enforced by seizing his goods, or he might be proceeded against to outlawry, thus putting him out of the protection of the law, so that he would be incapable of bringing an action for the redress of injuries; and, of course, of appealing from or otherwise questioning any judgment which might be recovered against him until the outlawry was reversed. It is more than questionable, per-

haps, whether this proceeding could ever have been resorted to in this country; and if it could by the ancient common law it could only be for felony; and later in actions for trespasses *vi et armis*. (Co. Litt., 128.) It is only by statute in England that it lies in any merely civil action. (3 Bl. Com., 284.)   The common law, therefore, afforded no remedy in a case like the present, and if the repealing clause of the Act of 1840 operated a repeal of the law authorizing the appointment of a curator, and also of the provision for the appointment of an attorney *ad litem*, it took away all remedy in cases like the present, and left the citizen wholly without any remedy whatever for the enforcement of his rights of action against absentees and non-residents, unless it was competent for the courts, as matter of practice, to adopt a mode of making parties where the law prescribed none."

It was under conditions and circumstances reflected by the foregoing and like authorities relating to international law, the common law, the Spanish law, and such adaptations thereof as had been made in various States, that the Fourteenth Amendment was adopted.   Is it strange then, that under it, the Supreme Court of the United States held, in Pennoyer v. Neff, that constructive service will not support a personal judgment against a *non-resident?*   We think not.   The wonder is, rather, that any court in this country ever held to the contrary.   But the history of the subject, which naturally impelled said decision in Pennoyer v. Neff, does not seem to us to require or justify the extension or applica-tion by this court of that doctrine to an absent citizen.

Although previously, and even before the adoption of the Fourteenth Amendment, that court had held the same way as to constructive service upon a non-resident, it seems that not until Pennoyer v. Neff was reached did it consider the subject exhaustively, as it did, under said amendment, in that case, at least so far as the facts therein went.

The majority and the dissenting opinion each covered a wide range. That case immediately took and still holds rank as the leading one upon the question of the sufficiency of constructive or substituted service of any character as the foundation of a personal judgment against non-resident, and some, including the majority of our said Court of Civil Appeals, regard it in the same light with reference to an "absent" defendant,—a citizen of the State in which such judgment is rendered, while others, including Associate Justice Hodges, dissenting, do not.

Neff sued Pennoyer for land lying in the State of Oregon.   Neff claimed title under a patent from the United States; Pennoyer, under sheriff's sale by virtue of an execution under a personal judgment against Neff, in favor of Mitchell, rendered by an Oregon State court in another cause in which Neff, who was then a *non-resident* of Oregon, had been cited by publication only, under the Oregon statute, and had not appeared personally.   As in the case at bar, the issue was as to the validity of a former personal judgment, and depended upon the sufficiency or insufficiency of a citation by publication only to support it.

The decision of the Supreme Court of the United States, in Neff's

favor, holding that such process did not afford him "due process of law," wherefore said former judgment against him, based thereon, was void, rests, we think, upon the essential fact that he was, not a citizen of Oregon, but a non-resident.

However, in discussing therein the legal effect of such service, as applied to a non-resident—the single question raised by the facts and, therefore, the sole issue for decision therein—Mr. Justice Field expressed, at length, certain views, which, it seems, he had long entertained, as to the extraterritorial effect of process from State courts, which views, while susceptible of being restricted to the facts of that case, and in harmony with the decision of the majority therein, would, if applied to the facts of the case now before us, require here an affirmance of said decision of the Court of Civil Appeals, in favor of McDonald.

That the views so expressed by Mr. Justice Field, and his reasoning in support thereof, are applicable to the facts of this case, although Mabee was a citizen of Texas, and not a non-resident, is one of the two conclusions upon which rests said decision of our Court of Civil Appeals herein, and the majority opinion, by Associate Justice Levy. Referring to Pennoyer v. Neff, it says:

"The court stated the rules to be, (1) 'that every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory,' and (2) 'the other principle of law referred to follows from the one mentioned: that is, that no State can exercise direct jurisdiction and authority over persons or property without its territory.'

"Neff . . . was a non-resident of Oregon and a citizen and resident of California, and in that particular fact the instant case differs. But the two cases are identical in the fact of the absence of the defendant from the State at the time of the publication. And it was to the fact of being beyond the reach of the process, and not to the status of citizenship, a majority of this court think that the court in that case was applying, as governing, the principle that a court has no power to extend its process beyond the limits of the State, and the laws of one State have no operation outside of its own territory."

The other ground of that decision herein is that natural justice is not satisfied by a citation by publication for an absent citizen, but requires, as in the case of a non-resident, personal notice within the State or entry of appearance.

In support of his views Associate Justice Levy cited the following cases:

Freeman v. Alderson, 119 U. S., 185, 30 L. Ed., 372. The real extent of that decision is that citation by publication, against a non-resident, in a suit over land, will not support a personal judgment for costs; citing Pennoyer v. Neff, 95 U. S., 714, 27 L. Ed., 565, and Cooper v. Reynolds, 10 Wall., 308, 19 L. Ed., 931, only.

Mr. Justice Field, again speaking for the court, after quoting from his opinion in Pennoyer v. Neff, did say this:

"To this statement of the law it may be added, what, indeed, is a conclusion from the doctrine, that whilst the costs of an action may properly be satisfied out of the property attached, or otherwise brought under the control of the court, no personal liability for them can be created against the absent or non-resident defendant; the power of the court being limited, as we have already said, to the disposition of the property, which is alone within its jurisdiction."

But in applying said doctrine to an "absent defendant," unless he used that term as being synonymous with "non-resident," he evidently went beyond the facts of the case before him, and that, also, was *dictum*.

Wilson v. Seligman, 144 U. S., 41, 36 L. Ed., 338. Under a Missouri statute it was there held that "a notice served in another State upon a person alleged to be a stockholder, and who has never resided in Missouri, is insufficient to support an order charging him with personal liability." (Syllabus.) The statute required that "sufficient notice in writing" be given but failed to say where or how. That court said:

"The defendant never resided in Missouri, and was not served with process within the State. . . . Personal service of the notice within the jurisdiction of the court is essential to support an order or judgment ascertaining and establishing such liability, unless he has voluntarily appeared, or otherwise waived his right to such service, which he has not done in this case."

That falls far short, we think, of upholding the proposition that service by publication, pursuant to statute, upon an absent citizen, will not support a personal judgment.

Ellenwood v. Marietta Chair Co., 159 U. S., 105, 30 L. Ed., 913, which is not in point.

Dull v. Blackman, 169 U. S., 243, 42 L. Ed., 733, wherein it was held that a personal judgment against a non-resident is not supported by personal service in a State other than that in which the judgment was rendered. It is significant, perhaps, that therein, Mr. Justice Brewer, speaking for the court, quoted as follows from Hart v. Sansom, 110 U. S., 151, 28 L. Ed., 101: "Such a decree, being *in personam* merely, can only be supported, against a person who is *not a citizen or resident of the State in which it is rendered,* by actual service upon him within its jurisdiction."

Associate Justice Levy refers, also, to Galpin v. Page, 18 Wall., 350, 21 L. Ed., 959, and Ableman v. Booth, 21 Howard, 506, 16 L. Ed., 169, both of which arose prior to the Fourteenth Amendment. The former arose under a statute of California which authorized a citation by publication, under certain conditions, when so ordered by the court; "but it nowhere appeared in the record that any application was ever made to the court or judge thereof for an order directing the publication, or that any such order was ever made."

Therein Mr. Justice Field, who spoke for the court, as he did in Pennoyer v. Neff, said:

"When, therefore, by legislation of a State, constructive service of

process by publication is substituted in place of personal citation, and. the court upon such service is authorized to proceed against the person of an absent party, *not a citizen of the State* nor found within it, every principle of justice exacts a strict and literal compliance with the statutory provisions."

In the latter case (Ableman v. Booth) the question of jurisdiction did not relate to process or appearance, but grew out of a conflict between a State court and a court of the United States, in matters involving the Constitution and laws of the United States.

Said opinion by Associate Justice Levy also cites these cases:

Tex. & Pac. Ry. Co. v. Gay, 86 Texas, 586, 26 S. W., 605. Held "the Circuit Court in Louisiana had not jurisdiction over property in Texas, such as conferred upon it power to take possession of and administer it through a receiver or otherwise."

Therein it was said: "Whether want of jurisdiction arises from the fact that the thing to be affected by judgment and process of a court is without its territorial jurisdiction or without its jurisdiction for any other reason is unimportant, for in either case the process is invalid because the court has not jurisdiction."

But that expression can have no relation to the point in issue here, unless it be first assumed that in said cause No. 5468 the District Court did not, by constructive service, acquire jurisdiction over Mabee, which assumption would render all citations useless.

Montanya v. Montanya (1896), 112 Calif., 101, 44 Pac., 345, 32 L. R. A., 82, 53 Am. St. Rep., 165. There the defendant was served by publication made in California and by personal notice·delivered to him in France, all in compliance with statute. Speaking for the majority of the court, and construing Pennoyer v. Neff as does Levy, A. J., Temple, J., said:

"Conceding that the defendant and the children are all domiciled in California, although in fact absent from the State at the time of the commencement of the action and since, and that the constructive service of summons was sufficient to give the court jurisdiction to grant the divorce, did the court have the power to award to plaintiff the exclusive custody of the children and to allow alimony? I have concluded that it had no such power."

Three members of that court of seven concurred; but the other three, including the Chief Justice, vigorously dissented, denying that the "due process clause places such restrictions upon the power of the State over the absent children and the defendant, who, they found, was a native of California, and had lived his whole life there until he clandestinely took the children to France and fraudulently acquired a domicile there to defeat the purposes of the suit, intending to then return with the children to his native State"; citing numerous authorities.

Bickerdike v. Allen, 157 Ill., 95, 29 L. R. A., 782, 41 N. E., 740, in which says Associate Justice Levy, "it was held that mere publication would not as against a citizen gone out of the State be sufficient, but

that the publication supplemented by mailing to him a notice was sufficient."

In that case the Illinois court said:

"But this statute does something more than require the publication of the notice. It requires a copy of the notice to be sent by mail, addressed to the defendant whose place of residence is stated in the affidavit." That suit was upon *scire facias* to revive a personal judgment. Full compliance with said statute was shown. The statute provided that the certificate of the clerk that he mailed the notice should be evidence of the fact; the clerk certified that he mailed such notice; the court held that to be prima-facie evidence that the defendant received the notice; also that the notice by publication and mail to "a resident of the State who could not be found in it" was sufficient, under the Fourteenth Amendment and the State Constitution,—but not so as to a non-resident. But in Montanya v. Montanya, *supra,* the California statute provided for like personal notice by mail, which was also given in that case; yet the majority held it and citation by publication together insufficient to support the judgment against the absent citizen for alimony. So those two cited cases differ materially in principle, the opinion in the California case being the more extreme.

The Illinois case did say: "If the statute provided for bringing in a resident of the State by publication of the notice only, without the mailing of any notice to him, the same objection might lie as in the case of a non-resident"; but it does not definitely appear, and they were not called upon to say, whether, had their statute omitted provision for mailing notice, as does our article 1874, they would or would not have held it unconstitutional as applied to an absent citizen. (See our R. S., articles 1869-70, relating to personal notice "where the defendant is absent from the State or is a non-resident.")

In holding notice by publication and mail good as to an absent citizen, yet expressly declaring, as they did, concerning a non-resident, that "the judgment of revival can not be regarded as valid if such non-resident has not been personally served or has not entered his appearance, but has only been served by publication and the mailing of a notice to him to his residence outside of the State," the Illinois court plainly recognized a vital difference in the effects of the "due process" clause upon "absent citizens" and "non-residents." That case adds but little, if any, force to the views in support of which it is so cited.

Smith v. Grady, Ex'r., 68 Wis., 215, 31 N. W., 477. There a personal judgment by a Canadian court was held void because it was based solely upon service made upon the defendant in that action, personally, in Wisconsin, there being no personal appearance. When the debt arose defendant resided in Ontario, where said judgment was rendered, and was a subject of Great Britain, and so remained unto death, but, when so served with process, was not a resident of Ontario and had no property there. Said proceedings were found to be regular, under the laws of Ontario, which authorized said judgment. That decision rests squarely

upon the proposition that "jurisdiction can not be acquired or exercised over persons or property without the territorial limits of the government where the court sits," by "service of process in another State or foreign country." This was not attempted in the case at bar.

Another case, not cited by Associate Justice Levy, in which the majority opinion strongly supports his views as to the effect of Pennoyer v. Neff, is Raher v. Raher, 150 Ia., 511, 35 L. R. A. (N. S.), 252, 129 N. W., 494, Ann. Cas., 1912, D., 680, decided in January, 1911, wherein it was held that statutory provisions authorizing personal service of notice without the State on a defendant resident within the State violate the due process clauses of the Constitution of that State and of the Fourteenth Amendment. But from the argument in the majority opinion two members of the court, one being the Chief Justice, dissented.

On the other hand, the dissenting opinion, in the case at bar, by Associate Justice Hodges treats, not only the decision in Pennoyer v. Neff, but the views expressed therein and the reasoning of Mr. Justice Field in support thereof, as applicable *solely to non-residents.* Said dissenting opinion declares, in substance, that the sovereign power of the State follows its citizens, wherever they may go, to such extent as to justify the rendition by one of her courts of a personal judgment against him, such as was said District Court judgment in No. 5648, based upon constructive service in accordance with the provisions of her statutes. To that effect, it says, are previous decisions of this court, and the views of various text-writers. It points out the difference which exists in the relations between the State and her citizens, upon one hand, and the State and a non-resident, upon the other hand, and finds therein what its author considers a sufficient reason for holding constructive service upon the former sufficient to support a personal judgment against him, in that he is constructively ever present in the State which then accords to him the rights and privileges of citizenship. It refers to the settled practice, under State statutes, of requiring foreign corporations seeking admittance to do business within the State to designate therein an agent for service, and asks:

"Is it going too far to say that one who takes up his residence within the State invokes the protection of its laws, and enjoys its rights and immunities, shall be held to have consented that he may be served with notice by publication when temporarily beyond its limits?" And it cogently sums up the whole matter thus: "To hold that constructive notice is binding on an absent defendant is not giving such service extraterritorial effect, but is merely saying that the absent citizen is amenable to its intra-state effect."

Among authorities cited by Associate Justice Hodges in support of his views are these: Knowles v. Gaslight and Coke Co., 19 Wall., 59, 22 L. Ed., 70, wherein the court said, in 1873:

"We do not mean to say that personal service is in all cases necessary to enable a court to acquire jurisdiction of the person. Where the defendant resides in the State in which the proceedings are had, service

at his residence, and perhaps other modes of constructive service, may be authorized by the laws of the State. But in the case of non-residents, like that under consideration, personal service can·not be dispensed with unless the defendant voluntarily appears."

Northcraft v. Oliver, 74 Texas, 162, 11 S. W., 1121; Fernandez v. Casey, 77 Texas, 452, 14 S. W., 149; Horst v. Lightfoot, 103 Texas, 643, 132 S. W., 761; Treadway v. Eastburn, 57 Texas, 209; Bickerdike v. Allen, *supra*, Re Denick, 92 Hun, 161, 36 N. Y. Supp., 518; Montanya v. Montanya, *supra*, dissenting opinion; Freeman on Judgments, sec. 570; 2, Black on Judgments, sec. 907.

These conflicting opinions from our Court of Civil Appeals fairly illustrate the status of decisions throughout the country as to the relation, *vel non*, of Pennoyer v. Neff to personal actions against absent citizens, and succinctly outline the principal reasons which, in other States, have naturally led to conflicting decisions and dissenting opinions.

Aside from the reference to Cooper v. Reynolds, 10 Wall., 308, 19 L. Ed., 931, Pennoyer v. Neff affords strong intrinsic evidence tending to support the view that it was not meant to announce any rule concerning absent citizens. If it did it was, to that extent, mere *dictum*, Neff being a non-resident.

We make these excerpts:

"Every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory. As a consequence, every State has the power to determine for itself the civil *status* and capacities of its inhabitants; to prescribe the subjects upon which they may contract, the forms and solemnities with which their contracts shall be executed, the rights and obligations arising from them, and the mode in which their validity shall be determined and their obligations enforced."

"Inhabitants," we may fairly assume there includes "citizens." Hinds v. Hinds, 1 Ia., 36; Ex parte Shaw, 145 U. S., 444, 36 L. Ed., 768; Potter v. Ross, 23 N. J. L., (3 Zab.), 517; Boardman v. Bickford (Vt.), 2 Aikens, 345; Barnett's Case (Pa.), 1 Dall., 152; Sears v. Boston, 42 Mass. (1 Metc.), 250.

If so, the excerpt stands as a sweeping assertion of what may be termed the sovereign right of control of a State over its citizens, whether they be within or without its borders.

After conceding the sufficiency of constructive service as a basis for judgments, of various kinds, *in rem*, said opinion says: "But . . . where the suit is merely *in personam*, constructive service in this form upon a non-resident is ineffectual for any purpose"—the very heart of the decision upon the facts there involved, emphasis being laid, apparently, upon "non-resident." And, as though still having only non-residents in mind, it adds: "Process from the tribunals of one State can not run into another State, and summon parties there domiciled to leave its territory and respond to proceedings against them. Publication of process or notice within the State where the tribunal sits can not create any greater obligation upon the non-resident to appear."

It also says:

"To prevent any misapplication of the views expressed in this opinion, it is proper to observe that we do not mean to assert, by any thing we have said, that a State may not authorize proceedings to determine the *status* of one of its citizens towards a non-resident, which would be binding within the State though made without service of process or personal notice to the non-resident. The jurisdiction which every State possesses to determine the civil status and capacities of all its inhabitants. involves authority to prescribe the conditions on which proceedings affecting them may be commenced and carried on within its territory." For example, it refers to divorce proceedings against a non-resident.

The sole purpose in making exceptions from the general rule so set forth in said first excerpt seems to have been to make plain the fact that in the excepted classes of cases the sovereign power of the State extends to even *non-residents*.

Said opinion closes thus:

"The question here respects only the validity of a money judgment rendered in one State, in an action upon a simple contract against the resident of another, without service of process upon him, or his appearance therein."

In short, the case was one against a non-resident, and in legal effect, it is with them only that it deals. The fact that the exceptions therein made do not include absent citizens is without significance, because the facts of that case did not reach them. It is reasonable to suppose that had that court intended to hold or say that the doctrine of that case was applicable to them the declaration would have been made with unmistakable clearness and force.

But while the references in that opinion to Cooper v. Reynolds, *supra,* are not satisfactorily clear in meaning, it must be conceded that they may reasonably be considered as amounting to an abstract assertion or intimation, at least, that in the entire matter of constructive service non-residents and absent citizens stand upon the same plane.

However, what was said by the court in that cited case, relative to the personal judgment based upon citation by publication, was, itself, but *dictum.*

That action involved only a collateral attack upon a land title derived through sale under attachment based on an affidavit to the effect that defendants had fled from the State, or were in concealment, etc., which affidavit, that court presumed, had been followed up by citation by publication, all in compliance with the Tennessee statute.

It was urged, in support of the collateral attack, that the attachment proceedings were irregular, that the affidavit was defective, and that notice was not published.

Held: Because of the attachment the proceeding became, "in its essential nature, a proceeding *in rem,* the only effect of which is to subject the property attached to the payment of the demand which the court may find to be due to the plaintiff; . . . when the writ has been

issued, the property seized, and that property been condemned and sold, we cannot hold that the court had no jurisdiction for want of a sufficient publication of notice," citing Voorhees v. The Bank of the United States, 10 Peters, 449, 9 L. Ed., 490.

The effect of the original judgment in Cooper's Case *as a personal judgment* was not material to the decision, which, as a whole, plainly recognizes the fact that, when provided by statute, constructive service may be valid, under some circumstances, and to some extent.

Of said Voorhees Case the court, in Cooper's Case, said: "It was much like this. The defendant there, as here, held land under attachment proceedings against a non-resident who had never been served with process or appeared in the case," and there, as in the Cooper Case, the court held that irregularities complained of were not fatal in a collateral proceeding. The analogy consisted, it seems, not in non-residence, but in collateral attack upon attachment proceedings; which attack, in each instance, was held ineffective, the defendants in one case being absent citizens and the defendant in the other case having been a non-resident.

But from the decision in the Cooper Case Mr. Justice Field dissented, briefly, upon the ground that in the original cause the State court "never acquired jurisdiction." That illustrates the extremity of his views in the matter of personal service within the State, whether the defendant be absent citizen or non-resident; but therein he stood alone, in Cooper's Case; and, inasmuch as that point was not involved in Pennoyer's Case, we may well assume that his views' thereon, as therein expressed, amounted, at most, to a mere reiteration of his individual opinion upon an irrelevant matter. Quoting *dictum,* in support of *dictum* can not overthrow an established fundamental principle in American jurisprudence, nor justify State courts throughout the United States in striking down, as unconstitutional, statutes authorizing substituted and constructive service, or either, upon absent citizens.

The doctrine of Pennoyer v. Neff, *as to non-residents,* is now settled law throughout the United States. Hart v. Sansom, 110 U. S., 151, 28 L. Ed., 101; Freeman v. Anderson, 119 U. S., 185, 30 L. Ed., 372; Wilson v. Seligman, 144 U. S., 41, 36 L. Ed., 338; Goldey v. Morning News Co., 156 U. S., 518, 39 L. Ed., 517; St. Clair v. Cox, 106 U. S., 350, 27 L. Ed., 222; Mexican C. Ry. Co. v. Pinkney, 149 U. S., 194, 37 L. Ed., 699; Dewey v. Des Moines, 173 U. S., 203, 43 L. Ed., 665; Grannis v. Ordean, 234 U. S., 385, 58 L. Ed., 1363.

Throughout the country State courts have generally followed it, some more strictly than others.

Prior to the decision in Pennoyer v. Neff this court held that notice by publication within this State, or personal notice without it, in compliance with our statutes, would support a personal judgment against a non-resident: Butterworth v. Kinsey, 14 Texas, 500 (1885).

See also: McMullen v. Guest, 6 Texas, 275 (1851); Campbell v.

Wilson, 6 Texas, 379 (1851); Mickie v. McGehee, 27 Texas, 135 (1863); Wilson v. Zeigler, 44 Texas, 657 (1876).

But in each of these four cases the non-resident defendant entered an appearance, thereby submitting himself to the jurisdiction of the court; upon which point see York v. State, 73 Texas, 657, 11 S. W., 869 (1889), adhering to Pennoyer v. Neff, but construing our statutes relative to appearance and answer; also York v. Texas, 137 U. S., 15.

In Wilson v. Zeigler, *supra,* wherein Wilkinson had been cited by publication only, the trial court held: "Wilkinson being a non-resident, and not being served with a citation, nor any property of his being in the State seized by process, the court has nothing before it to which the judgment of the court can be made to apply, and the court is without jurisdiction as to him," although he had filed an answer to the merits. In reversing and remanding that cause, this court, through Ireland, J., said:

"Personal judgments on service by publication are common to the proceedings in courts of most of the States of the Union, and their validity and force has been almost universally recognized within the jurisdiction where they are rendered. (Boswell's Lessee v. Otis, 9 How., 350; Oakey v. Aspenwall, 4 Comst., 513; Nations v. Johnson, 24 How., 203; Freeman on Judgments, sec. 127.) . . . In this case there are three things shown by the record, either one of which gave the court jurisdiction over Wilkinson: 1st, it is shown that he had property in Colorado county; 2d, the plaintiff is a citizen of Colorado county; and, 3d, Wilkinson appeared by attorney, and answered. Of course in the two first cases mentioned there must have been service by publication or otherwise."

For a review of that case, see Stewart v. Anderson, 70 Texas, 588, 8 S. W., 295.

In Johnson v. Herbert, 45 Texas, 304 (1876), in an opinion by Chief Justice Roberts, this court said: "The court erred in dismissing the petition, upon the ground of a want of jurisdiction, on account of the defendants being alleged to be non-residents. It was alleged that one of the defendants had property within the jurisdiction of the court," citing Wilson v. Zeigler, *supra.*

In 1883, in Liles v. Woods, 58 Texas, 416, the non-resident defendant having appeared and filed a plea to the jurisdiction, this court held: "It is unimportant whether he was a resident of the State or not."

And since said decision in Pennoyer v. Neff, this court in Rice v. Peteet, 66 Texas, 568 (1886), through Chief Justice Willie, upheld a personal judgment by a justice of the peace against non-resident defendants upon the ground that the citation, which was by publication only, was sufficient; saying in substance, that our law gave plaintiff the right to obtain an attachment on the ground that defendants were non-residents, but did not compel him to do so in order to be entitled to bring suit; but another ground upon which jurisdiction was upheld

was that defendants appeared and submitted the issues of law and of fact to the court, following Liles v. Woods, *supra*.

But speaking generally, this court has closely followed Pennoyer v. Neff, as to non-residents. Since that decision was rendered this court has held that where, by attachment and statutory constructive service, or otherwise through such service, in the absence of an appearance, a State court acquires jurisdiction over a non-resident in a proceeding *in rem*, or *quasi in rem*, that jurisdiction does not extend beyond his property within the State, and will not support a personal judgment against him. Stewart v. Anderson, 70 Texas, 588, 8 S. W., 295 (1888) ; Harris v. Daugherty, 74 Texas, 1, 15 Am. St. 812, 11 S. W., 921; Hochstadler v. Sam, 73 Texas, 315, 11 S. W., 408; Martin v. Cobb, 77 Texas, 546, 14 S. W., 163; Goodman v. Henley, 80 Texas, 499, 16 S. W., 432; Foote v. Sewall, 81 Texas, 659, 17 S. W., 373; Taliaferro v. Butler, 77 Texas, 578, 14 S. W., 191; Hardy v. Beaty, 84 Texas, 562, 31 Am. St., 80, 19 S. W., 778. See, also, Kilmer v. Brown, 28 Texas Civ. App., 420, 67 S. W., 1090.

And it seems that, except as above indicated, ever since said decision in Pennoyer v. Neff, this court, in applying our statutes, has uniformly followed the doctrine of that case as to non-residents, in cases involving personal judgments without attachment or personal appearance of a non-resident defendant, (1) when he had been served by merely personal notice in another State, Scott v. Streepy, 73 Texas, 547, 11 S. W., 532; York v. The State, 73 Texas, 651, 11 S. W., 869; Masterson v. Little, 75 Texas, 682, 13 S. W., 154; Kimmarle v. Railway Co., 76 Texas, 686, 12 S. W., 698; Brewing Co. v. Hirsch, 78 Texas, 192, 14 S. W., 450; Maddox v. Craig, 80 Texas, 676, 16 S. W., 328 (1891) ; and, (2) when he had been served by merely publication within this State: Northcraft v. Oliver, 74 Texas, 162, 11 S. W., 1121 (1889) ; Horst v. Lightfoot, 103 Texas, 643, 132 S. W., 761.

But, this court, it seems, has never applied to absent citizens of this State the doctrine relating to non-residents which is enunciated in Pennoyer v. Neff. Indeed, it seems never to have considered that case applicable to absent citizens, or as intended to prescribe any rule as to them.

Traylor v. Lide, 7 S. W., 58 (1887), was an action of trespass to try title involving a collateral attack upon a personal judgment rendered by a justice of the peace in this State, under the Justice's Court Act of 1848, which, unlike the District Court Act of that year, did not attempt to authorize service by publication against non-residents, but did provide for such service upon oath "(1) that the defendant is absent from the State, or (2) that he is a transient person, so that the ordinary process of law can not be served upon him." (Hartley's Dig., 1719.) The following is from the opinion of the Commission of Appeals therein, which this court adopted:

"It may be admitted that the process of a State can not extend outside the territorial jurisdiction of the State so as to require a citizen of

another State to respond to a suit against him, still it would not follow that a judgment upon constructive service, by publication, upon a person within the State, who is transient or secretes himself so that the ordinary process of law could not be served upon him, would not be a valid and binding judgment.  Pennoyer v. Neff, 95 U. S., 715, 24 L. Ed., 565; St. Clair v. Cox, 106 U. S., 350, 1 Sup. Ct. Rep., 354, 27 L. Ed., 222. The authority is of the highest character that a judgment *in personam* against a non-resident, rendered by a State court upon service by publication, or even by personal service, is a nullity; but the reason and the authority both fail when the judgment is obtained by such service in a State court against its own citizens or against transient persons within the territorial jurisdiction of the State.  Our Supreme Court has often held that when the law is strictly complied with, judgment upon service by publication will be sustained, even upon writ of error or on appeal, and by a much stronger reason when collaterally attacked.  McMullen v. Guest, 6 Texas, 279; Hill v. Faison, 27 Texas, 428; Lawler v. White, 27 Texas, 250; Allen v. Wyser, 29 Texas, 150; Stephenson v. Railway Co., 42 Texas, 162; Hewitt v. Thomas, 46 Texas, 232; Moore v. Rice, 51 Texas, 289; Jones v. Jones, 60 Texas, 451; Brown v. Brown, 61 Texas, 45; Wilson v. Zeigler, 44 Texas, 657.  If the affidavit is upon a ground not given in the statute, and that fact affirmatively appears, the judgment would be void.  Stegall v. Huff, 54 Texas, 193. . . . We can not assume facts that must be assumed if we conclude the Boswells were not residents of this State."  See, also:  Hambel v. Davis, 89 Texas, 256, 34 S. W., 439.

In O'Neill v. Brown, 61 Texas, 34 (1884), this court approved a decision by our Commission of Appeals which upheld the validity of a personal judgment against a citizen of this State, actually resident and present therein, based upon citation by publication only.  And in Martin v. Burns, 80 Texas, 676, 16 S. W., 1072, this court approved a decision of our Commission of Appeals in which, through Judge Marrs, it was said:

"It follows that as the records of the County Court do not *affirmatively* show that S. P. Crockett was a *non-resident of this State* when the citation was made, that the rulings of the court below in holding that the judgment of the County Court of Mitchell County was valid and binding in so far as the question of notice was concerned, and that it could not be collaterally impeached by proof of facts *dehors* the record, were correct.  This conclusion is not in conflict with the doctrine of Pennoyer v. Neff, but is based entirely upon the absolute presumptions which the law indulges in support of a judgment of a domestic court of general jurisdiction and of the verity of its records.  It must now be regarded as a settled rule of decision in this State that when applicable the chief principle announced in Pennoyer v. Neff will be observed, and that when it affirmatively appears from the record that a purely personal judgment has been rendered against a non-resident, and citizen of another State, without appearance or waiver by him, upon citation by

publication alone, or by process beyond the State, such judgment can not be enforced and is subject to collateral attack. This is the extent to which the decisions in this State go. Northcraft v. Oliver, 74 Texas, 169, 11 S. W., 1121; Scott v. Streepy, 73 Texas, 547; York v. The State, 73 Texas, 651; Kimmarle v. Railway Co., 76 Texas, 695, 12 S. W., 698."

In Iams v. Root, 22 Texas Civ. App., 413, 55 S. W., 411 (1900), our Court of Civil Appeals for the First District through Pleasants, J., said:

"There is no question as to the correctness of the proposition that, unless it appears from the record that the defendant was a non-resident of the State at the time this suit was brought and service was had by publication, the court in which the case was tried being a domestic court of general jurisdiction, and having jurisdiction of the subject-matter of litigation, it will be conclusively presumed, on collateral attack, that it had jurisdiction over the person of the defendant, and a personal judgment was properly rendered against him." Application for writ of error therein was refused by this court.

That excerpt was quoted approvingly, by our Court of Civil Appeals for the Fourth District, in Gibson v. Oppenheimer, 154 S. W., 694, wherein Chief Justice Fly said, under a similar statute, article 1875 (1236):

"The sale made by virtue of the order of sale divested all of the right, title and interest of unknown heirs as fully as though they had been personally in court. They were inhabitants of Texas at the time they were cited by publication, and were bound by the laws of Texas in regard to citations by publication." In that case we denied a writ of error.

Hambel & Heasty v. Davis, 89 Texas, 256, 59 Am. St., 46, 34 S. W., 439, involved a collateral attack upon a personal judgment rendered under the Act of 1870 by a Texas justice of the peace against a resident of Kansas, but who, for several months had been engaged in business in the county in which said judgment was rendered. Speaking through our present Chief Justice Brown, this court said: "If his place of permanent residence was in another State, but he was at the time within this State, and a transient person, he might be cited by publication. Traylor v. Lide, 7 S. W., 58."

In Northcraft v. Oliver, 74 Texas, 162, 11 S. W., 1121 (1889), this court, through Henry, J., said explicitly:

"The rule that service by publication only does not confer jurisdiction in our courts is adopted by us in deference to the authority of the case of Pennoyer v. Neff, 95 United States Reports, and we are not disposed to extend it beyond the doctrine announced in that case.

"We understand that authority holding that such service does not confer jurisdiction over a non-resident of the State does not extend any further, and we hold as heretofore that such service upon our own resident citizens made in pursuance of our statutes is binding.

"It is, however, a question of residence abroad and not of the acquisition of citizenship in the new domicile."

In Horst v. Lightfoot, 103 Texas, 643, 132 S. W., 761, this court, through Williams, J., held:

"The allegation of the petition that the defendant was absent from the State, by itself, would not be inconsistent with the existence of power in the court to reach him with its writ, since one may be absent from the State and yet be a citizen of and resident in it, and therefore amenable to the process of its courts. But his absence may be because of non-residence, and this is what the petition and the affidavit for publication, construed together, show to have been true of Schneider; and it follows that jurisdiction over his person could not be obtained by constructive service."

In Fernandez v. Casey, 77 Texas, 452, 14 S. W., 149 (1890), this court, in an opinion by Henry, J., held squarely:

"The facts we think clearly show that Fernandez was a resident citizen of the State of Texas, and that though he was temporarily absent from the State he had never acquired a domicile elsewhere. Under these circumstances we think that service by publication of process against him according to the provisions of our statutes conferred upon the Justice Court the jurisdiction that it exercised in rendering judgment against him."

It is true, as suggested in the argument filed herein by Defendant in Error in person, that in that case this court decided the point "in six lines, without giving a single reason or citing a single authority"; yet, with precision and force, it therein upheld the validity of our statute, as applied to an absent citizen, although both Pennoyer v. Neff, *supra,* and Cooper v. Reynolds, *supra,* were invoked in behalf of appellant Fernandez. The ground of that decision by this court is made evident by the report of the case.

The doctrine enunciated in Fernandez v. Casey, *supra,* may be termed that of *sovereign control,* or, control by the State over its absent citizens.

The ground upon which that doctrine rests has been stated thus:

"Every subject or citizen of a country where legal proceedings are instituted owes allegiance to his country and submission to its laws. He impliedly consents to be bound by its laws so long as he remains a citizen and resident; and when the State enacts a statute with reference to procedure every citizen of necessity consents, and no matter where he may be does not change that assent until he renounces his former allegiance and in fact becomes a non-resident." Dissenting opinion in Raher v. Raher, *supra.* To the same effect is the dissenting opinion from our Court of Civil Appeals in the case before us.

This may be added: The laws of a State bind its citizens, whether they be considered as assenting thereto or not.

Among the authorities which support said doctrine of sovereign control with more or less force are these: Grover & Baker Machine Co. v. Radcliffe, 137 U. S., 287, 34 L. Ed., 670; same case, 66 Md., 511, 8 Atl., 265; Henderson v. Staniford, 105 Mass., 504, 7 Am. Rep., 551; Mercantile Co. v. Shoe Co., 51 Fla., 176, 4 L. R. A. (N. S.), 117, 120

Am. St., 153, 40 So., 436; Continental Bank v. Thurber, 74 Hun, 632, 26 N. Y. Supp., 956, affirmed in Continental Ntl. Bk. of Boston v. U. S. Book Co., 143 N. Y., 648; Ward Lbr. Co. v. Mfg. Co., 107 Va., 626, 17 L. R. A. (N. S.), 324, 59 S. E., 476; Bickerdike v. Allen, 157 Ill., 95, 29 L. R. A., 782, 41 N. E., 740; Sturgis v. Fay, 16 Ind., 429, 79 Am. Dec., 440; Duval v. Johnson, 39 Ark., 182; Bimeler v. Dawson, 5 Ill., 536, 39 Am. Dec., 430; Harryman v. Roberts, 52 Md., 64; Henneman v. Thompson, 8 Rich. (S. C.), 117; Huntley v. Baker, 33 Hun, 578; Cassidy v. Leitch, 2 Abb. (N. Y.), N. C., 315; Biesenthall v. Williams, 1 Duv. (Ky.), 328, 85 Am. Dec., 629; Barrett v. Black, 25 Ga., 151; Hamill v. Talbott, 72 Mo. App., 22; Hinckley v. R. Co., 70 Minn., 105, 72 N. W., 835; Beard v. Beard, 21 Ind., 321; Holt v. Alloway, 2 Blackf. (Ind.), 108; Re Denick, 92 Hun, 161, 36 N. Y. Supp., 518; Hunt v. Hunt, 72 N. Y., 217, 28 Am. Rep., 129; Campbell v. Campbell, 90 Hun, 233, 35 N. Y. Supp., 280, 693; Cole v. Hoeburg, 36 Kans., 263, 13 Pac., 275; Happy v. Mosher, 48 N. Y., 313; Spencer v. Houghton, 68 Calif., 87, 8 Pac., 679; Burnham v. Commonwealth, 1 Duv. (Ky.), 211; Gibbs v. Insurance Co., 63 N. Y., 114, 20 Am. Rep., 513; Welch v. Sykes, 3 Gilman (Ill.), 197; Wood v. Watkinson, 17 Conn., 500, 44 Am. Dec., 562; Bank v. Bank, 87 Iowa, 479, 54 N. W., 472; Galvin v. Dailey, 109 Iowa, 332, 80 N. W., 420; Insurance Co. v. Pinner, 43 N. J. Eq., 52, 10 Atl., 184; Johnson v. Story County, 148 Iowa, 539, 126 N. W., 153.

In the majority opinion in Raher v. Raher, supra, decided Jan. 19, 1911, it was said: "It must be conceded, however, that we have found no case in which it has been specifically held under pertinent facts that a personal judgment against a resident, who is actually served with notice outside of the territorial limits of the State is void." In the dissenting opinion therein it was said: "No court, so far as I have been able to find, has gone to the extent (to) which the majority find it necessary to go in this case."

Black on Judgments, 2nd ed., says, in par. 227:

"Every sovereignty has plenary control over its own subjects, and it may authorize a judgment to be rendered against one of its citizens, upon constructive notice only, and although he is temporarily absent from its dominions, and such a judgment must be everywhere recognized as valid and of binding force and effect." See, also, par. 907.

Freeman on Judgments, 4th ed., par. 570, says: "In relation to the extra-territorial effect of a judgment procured against a person in the State of his domicile, in an action in which he entered no appearance, and in which the process was served constructively, in accordance with the laws of that State, radical and irreconcilable differences of opinion exist. . . . The position, however, which seems to be the best sustained, both by reason and by precedents, is that each State has the authority to provide the means by which its own citizens may be brought before its court; that the courts of other States have no authority to disregard the means thus provided, and finally, that every

judgment or decree obtained in a State against some of its citizens, by virtue of a lawful though constructive service of process. should be as obligatory upon such citizens in every other State as it is in the State whence it is taken."

Mr. McGehee, in "Due Process of Law," p. 54, thus sums up the result of his thorough study of the subject:

"If a particular procedure is found to have been sanctioned by English practice and adopted as suited to the conditions in this country, it measures up to the requisites of due process"; though, as he suggests, other procedure may do so.

Grover & Baker Machine Co. v. Radcliffe, *supra,* was an action brought in a State court in Maryland by the Machine Company against James Benge and John Benge, then citizens of Delaware, by summons and attachment on warrant, which was served on Radcliffe as garnishee, who thereupon filed pleas on behalf of the Benges, according to the Maryland practice, thereby putting in issue the validity of the judgment which the declaration made the basis of said action; said judgment having been rendered in 1874, by a prothonotary of Pennsylvania, under a statute of that State, without citation or service upon either of the Benges, but upon an instrument which had been executed by them at a time when James Benge was a citizen of Pennsylvania and John Benge was a citizen of Maryland, said instrument being a bond, in favor of the Machine Company, which contained the provision "we hereby authorize any attorney of any court of record in the State of New York or any other State to confess judgment against us for the said sum, with release of errors, etc."

Said Pennsylvania statute provided for entry of judgment upon such bond, etc., "without the agency of an attorney, or declaration filed." Holding that said statute did not authorize said judgment, the Maryland trial court instructed a verdict for the garnishee, Radcliffe, and, upon appeal, that action was affirmed by the Court of Appeals of Maryland (66:501) in an opinion which held that as the *amount due* on the bond was not expressed therein and could not be ascertained by calculation from anything appearing upon its face the case probably did not come within the purview of the Pennsylvania statute, but that, in any event, as to John Benge the judgment so entered by the prothonotary was void because: "He was a citizen and resident of Maryland, both when the bond was executed, and when the judgment was entered, and it is land, alleged to be his, located in Maryland, which is sought by this attachment to be condemned for the satisfaction of this judgment. He was never served with process, never appeared in person or by attorney," etc.

That decision and its reasoning relative to want of jurisdiction of the Pennsylvania court over the non-resident, John Benge, were approved by the Supreme Court of the United States (137:287) in an opinion by Chief Justice Fuller, which said:

"John Benge was a citizen of Maryland when he executed this obliga-

tion. . . . The record did not show, nor is it contended, that he was served with process, or voluntarily appeared, or that judgment was confessed by an attorney of any court of record of Pennsylvania. Upon its face, then, the judgment was invalid, and to be treated as such when offered in evidence in the Maryland court."

And in discussing the effect of the Pennsylvania statute, it said:

"But we do not think that a citizen of *another State than Pennsylvania* can be thus presumptively held to knowledge and acceptance of particular statutes of the latter State. What Benge authorized was a confession of judgment by any attorney of any court of record in the State of New York or any other State, and he had a right to insist upon the letter of the authority conferred. By its terms he did not consent to be bound by the local laws of every State in the Union relating to the rendition of judgment against their own citizens without service or appearance, but on the contrary made such appearance a condition of judgment."

It is significant, we think, that neither the Court of Appeals of Maryland nor the Supreme Court of the United States held said Pennsylvania judgment invalid as to James Benge, whose status with regard to it is not shown to have been different from that of John Benge, with the single exception that when they executed said bond, etc., the latter was a citizen of Maryland, but the former was a citizen of Pennsylvania.

It is shown that when suit was brought in Maryland both James and John Benge resided in Delaware, but it does not appear to what State the fealty of either, as a citizen, was due when the Pennsylvania judgment was rendered. In dealing with it neither of said decisions treated James Benge as a citizen of Pennsylvania. We think it fair to assume that the Court of Appeals of Maryland and the Supreme Court of the United States, each, considered that judgment valid as to James Benge, under the Pennsylvania statute, because he was a citizen of that State, at least when he executed said bond, etc., and, therefore, was to be treated as assenting to and bound by its law relating to the effect to be given to such an instrument as a basis for such judgment. Both of said decisions cite Pennoyer v. Neff approvingly.

However, as though to draw, in rugged outline, the fundamental distinction between the rule applicable to non-residents, under which said Pennsylvania judgment was *held void* as to John Benge, the *non-resident,* and the rule applicable to citizens, under which, we infer, said judgment was *not* held void as to James Benge, the *citizen,* that great tribunal which, ultimately, must settle, for the States, the constitutional question here involved, said, also:

"Publicists concur that domicile generally determines the particular territorial jurisprudence to which every individual is subject. As correctly said by Mr. Wharton, the nationality of our citizens is that of the United States, and by the laws of the United States they are bound in all matters in which the United States are sovereign; but in other matters their domicile is in the particular State, and that determines

the applicatory territorial jurisprudence. A foreign judgment is impeachable for want of personal service within the jurisdiction of the defendant, this being internationally essential to jurisdiction in all cases in which the defendant is not a subject of the State entering judgment; and it is competent for a defendant in an action on a judgment of a sister State, as in an action on a foreign judgment, to set up as a defence, want of jurisdiction, in that he was not an inhabitant of the State rendering the judgment and had not been served with process, and did not enter his appearance. Whart., Conflict Laws, secs. 32, 654, 660; Story, Conflict Laws, secs. 539, 540, 586."

That such was the thought and purpose of the Supreme Court of the United States is made plain by an examination of the authorities so cited.

· From said work by Mr. Wharton (3rd ed., Parmele), we make these extracts:

"Par. 32. . . . In several important relations, therefore, as is well shown by Savigny, domicile determines the particular territorial jurisprudence to which every individual is subjected."

Par. 654. "A foreign judgment, as we have seen, is impeachable for want of jurisdiction; and hence, for want of personal service within the jurisdiction, on the defendant, this being internationally essential to jurisdiction in all cases in which the defendant is not a subject of the State entering judgment." Note 3, by reference, after stating the rule as to non-residents, adds: · "It is otherwise, however, when the defendant is a resident of the State in which the judgment is rendered, though absent therefrom at the time."

Par. 660. "It is competent for the defendant, however, to an action on a judgment of a sister State, as to an action on a foreign judgment, to set up as a defense, want of jurisdiction of the court rendering the judgment; and, as indicating such want of jurisdiction, to aver by plea that the defendant was not an inhabitant of the State rendering the judgment, and had not been served with process, and did not enter his appearance; or that the attorney was without authority to appear."

The following excerpts are from the 8th edition of said work by Mr. Story:

Par. 539. . . . "The laws of a sovereign rightfully extend over persons who are domiciled within his territory, and over property which is there situate."

Par. 540. . . . "These (persons) may be either citizens, native or naturalized, or foreigners. In regard to the former, while within the territory of their birth or of their adopted allegiance, the jurisdiction of the sovereignty over them is complete and irresistible. It cannot be controlled; and it ought to be respected everywhere. But as to citizens of a country domiciled abroad, the extent of jurisdiction which may be lawfully exercised over them in personam is not so clear upon acknowledged principles. It is true that nations generally assert a claim to

regulate the rights and duties and obligations and acts of their own citizens, wherever they may be domiciled. And so far as these rights, duties, obligations and acts afterwards come under the cognizance of the tribunals of the sovereign power of their own country, either for enforcement or for protection or for remedy, there may be no just ground to exclude this claim."

Par. 586. . . . "In order, however, to found a proper ground of recognition of any foreign judgment in another country, it is indispensable to establish that the court pronouncing judgment should have a lawful jurisdiction over the cause, over the thing, and over the parties. If the jurisdiction fails as to either, it is (as we have already seen) treated as a mere nullity, having no obligation, and entitled to no respect beyond the domestic tribunals."

It must be conceded, first, that it is only by implication that the validity of the Pennsylvania judgment was so recognized as valid, as against James Benge, and second, that the principle of sovereign control over the citizen, there plainly recognized, was not extended as far as it is necessary to go to uphold, in this case, jurisdiction of the District Court to render a personal judgment against Mabee, in cause No. 5468; yet we think said opinion by Chief Justice Fuller tends strongly to support, in its full extent, the decision of this court in Fernandez v. Casey, supra. In their real or supposed bearings upon absent citizens we set Machine Co. v. Radcliffe over against Pennoyer v. Neff.

There can be no valid objection to the character of service herein, since notice by publication in a newspaper, such as was given in the case at bar, is one of the most reasonable and customary statutory forms of constructive service. 32 Cyc., p. 462, and note 81.

It is generally held, and is sound in principle, that whenever, under the facts, any sort of constructive or substituted service is permissible and valid its kind or character is a matter of legislative discretion, provided, only, it "affords the party fair opportunity to appear and defend his interests." Townes' Texas Pleading, 2 ed., 44; Thouvenin v. Rodrigues, Stewart v. Anderson, Pennoyer v. Neff, all supra; Grannis v. Ordean, 234 U. S., 393, 58 L. Ed., 1363; Antoni v. Greenhow, 107 U. S., 769, 3 L. Ed., 468; Sugg v. Thornton, 132 U. S., 524, 33 L. Ed., 447; Arndt v. Griggs, 134 U. S., 316, 33 L. Ed., 918; York v. Texas, 137 U. S., 15, 34 L. Ed., 604; Holden v. Hardy, 169 U. S., 366, 4 L. Ed., 780; Hooker v. Los Angeles, 188 U. S., 314, 47 L. Ed., 487, 63 L. R. A., 471; Bryant v. Shute's Exr., 147 Ky., 268, 144 S. W., 32, and cases cited; Mason v. Messenger, 17 Iowa, 261; Matter of Empire City Bank, 18 N. Y., 200; Beard v. Beard, 21 Ind., 321; Jarvis v. Barrett, 14 Wis., 591; Betancourt v. Eberlin, 71 Ala., 461; Harryman v. Roberts, 52 Md., 65; Raher v. Raher, 150 Iowa, 511, 129 N. W., 494, 35 L. R. A. (N. S.), 301; Johnson v. Story County, 148 Iowa, 539, 126 N. W., 153; Mutual Life Insurance Co. v. Pinner, 43 N. J. Eq., 52, 10 Atl., 184; Bernhardt v. Brown, 118 N. C., 700, 36 L. R. A., 402, 24 S. E., 527, 715; Nelson v. Railway Co., 225 Ill., 197, 8 L. R. A. (N. S.),

1186, 116 Am. St. Rep., 133, 80 N. E., 109; Freeman on Judgments, sec. 127; Sedg. on Const. of Stat. and Const. Law, 2nd ed., 476.

It certainly can not be said that the process here under review and such notice as it probably afforded to Mabee are contrary to the tenets of international law, or that they are not fully as consonant with the behests of natural justice as those which have long been upheld by the Supreme Court of the United States in various classes of cases, against non-residents in proceedings *in rem,* or *quasi in rem,* etc., affecting, more or less directly, the public welfare, such conclusions being based upon considerations of public necessity, and in cases against non-residents involving assent in advance by the defendant.

And in many cases essentially similar to said District Court cause No. 5468, involving the same vital principle relative to absent citizens, service by publication, or in some statutory form of no greater intrinsic merit, so far as imparting actual notice to the defendant is concerned, has been upheld, almost from time immemorial, by most English speaking courts wherein the issue has arisen, and has been approved in this country, in all modern times by the most eminent and able writers on law.

The above quoted provisions of Rev. Stats., article 2026, relating to new trials, have been construed liberally in favor of judgment debtors. Wiseman v. Cottingham, 174 S. W., 281, recently decided by this court, in which the citation by publication was against unknown heirs, under Rev. Stats., article 1875 (1236). See, also: Cundiff v. Teague, 46 Texas, 475; Miles v. Dana, 13 Texas Civ. App., 240, 36 S. W., 848; Brown v. Dutton, 38 Texas Civ. App., 294, 85 S. W., 454.

Mabee is not shown to have even attempted to avail himself of their benefits, nor not to have had timely knowledge of that judgment against him. On the contrary, in this action he pleads said judgment in bar, and relies upon it as a valid personal judgment against him.

The attack here made upon said district court judgment being, substantially, one against the constitutionality of the statute which authorized it, should not be sustained unless said statute is plainly invalid. We can not say that it is unconstitutional. On the contrary, regarding legal principles as of more consequence than are abstract definitions, we are of the opinion that the doctrine of Fernandez v. Casey, *supra,* which has become a rule of property in Texas, is sound, and that our statute which is here drawn in question, article 1874, is not repugnant to either of the foregoing constitutional provisions, and said District Court judgment is, therefore, a valid and subsisting judgment against Mabee, binding upon him as an absent citizen of Texas, and, consequently, good against the collateral attack so made upon it. As to Mabee, the cause of action upon the note, asserted in this suit, merged into that District Court judgment. Bute v. Brainerd, 93 Texas, 137, 53 S. W., 1017.

The judgment of the Court of Civil Appeals herein is reversed and that of the County Court is affirmed.

MR. CHIEF JUSTICE BROWN and MR. JUSTICE PHILLIPS, concurring.

We concur in the determination that the judgment of the honorable Court of Civil Appeals should be reversed and that of the County Court should be affirmed, basing our opinion that the service by publication upon the defendant in the original judgment was valid, upon the undoubted principle of the amenability of the citizen of the State to its laws, the right of the State to provide by statute for that character of service upon an absent citizen, and the express previous decision of the question by this court in Fernandez v. Casey, 77 Texas, 452, 14 S. W., 149.

                *Reversed and judgment of County Court affirmed.*